ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW; Kalamazoo Chapter of the Bertha Reynolds Society; Juan Cahue; Joe Ziolkowski; Catherine LaPalm; Robert S. Hackett; Cass Corridor Neighborhood Dev. Corp.; Westside Mothers; United States of America, Plaintiffs–Appellees,

Project Vote, Intervenor–Appellee,

v.

Candice MILLER, acting in her official capacity as Michigan Secretary of State; John Engler, acting in his official capacity as Michigan Governor; Christopher Thomas, Director of the MI Bureau of Elections, acting in his official capacity; Gerald H. Miller, in his official capacity as Director of the MI Department of Social Serv.; Vernice Davis Anthony, in her official capacity as Director of the MI Dept. of Public Health; Peter Gris-

wold, in his official capacity as Director of MI Rehabilitation Services; James Haveman, Jr., in his official capacity as Director of the MI Dept. Of Mental Health; State of Michigan, Defendants– Appellants.

No. 96–1229.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 3, 1997.

Decided Nov. 3, 1997.

Steven B. Flancher (argued and briefed), Gary P. Gordon (briefed), Office of the Attorney General of Michigan, Lansing, Michigan, for Appellants.

Seth M. Galanter (argued and briefed), U.S. Department of Justice, Civil Rights Division, Washington, DC, Paul J. Denenfeld (argued and briefed), Detroit, Michigan, for Appellees.

Spencer C. Livingston (briefed), New Orleans, Louisiana, for Intervenor–Appellee.

David A. Price, Daniel J. Popeo (briefed), Washington Legal Foundation, Washington, DC, for Amicus Curiae.

Before: MARTIN, Chief Judge; NORRIS and MOORE, Circuit Judges.

MARTIN, C. J., delivered the opinion of the court, in which MOORE, J., joined. NORRIS, J. (p. 838), concurred in the result.

## OPINION

BOYCE F. MARTIN, Jr., Chief Judge.

Claiming that the National Voter Registration Act of 1993 violates the United States Constitution, the State of Michigan and various Michigan officials appeal the judgment of the district court ordering Michigan to comply with the dictates of the Act.

The district court upheld the constitutionality of the National Voter Registration Act, finding that it does not violate the Tenth Amendment. Further, the district court held that the United States, Project Vote, and the LaPalm plaintiffs were entitled to bring their actions despite their failure to meet the Act's notice requirement. We agree with the district court that the National Voter Registration Act is constitutional, and that all of the involved plaintiffs are entitled to bring suit.

### I

The right to vote has long been recognized as central to the protection and exercise of the other rights guaranteed in our society. As noted by the Supreme Court in *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964), "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." Nevertheless, many practical barriers remain that inhibit the free exercise of this recognized right. Among such barriers are restrictive or prohibitively inconvenient voter registration requirements

that discourage or even prevent qualified voters from registering and participating in elections. In an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements, Congress passed the National Voter Registration Act in 1993. 42 U.S.C. § 1973gg(a), (b).

The Act requires states to offer voter registration by mail, by application in person at all offices in the state providing public assistance or administering state-funded programs which primarily provide services to persons with disabilities, and by application in person while applying for a motor vehicle driver's license. 42 U.S.C. § 1973gg–2. It also sets requirements for removing registrants from the voter registration roll because of a change of residence. 42 U.S.C. § 1973gg–6(d)(1)(A), (B). For states, like Michigan, whose state constitutions did not require alteration to permit compliance with the Act, the Act became effective on January 1, 1995. H.R.Rep. No. 9, 103d Cong., 1st Sess. 21 (1993), U.S. Code Cong. & Admin. News at 105, 146.

In spite of the Act's laudable goals, many states have refused to comply with its mandates, claiming that the Act is unconstitutional. To date, however, none of these challenges has been successful. *See Association of Comm. Org. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791 (7th Cir.1995); *Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 815, 133 L.Ed.2d 759 (1996).

When a state fails to comply with the Act, the Act authorizes judicial intervention. Under 42 U.S.C. § 1973gg–9(a), the Act authorizes the Attorney General to seek declaratory or injunctive relief; under 42 U.S.C. § 1973gg–9(b), the Act establishes a private right of action for individuals aggrieved by a violation, who meet the Act's notice requirement.

On January 5, 1995, Michigan enacted Public Act 441 of 1994 in order to conform its voter registration procedure to the requirements of the National Voter Registration Act. On January 10, however, Michigan Governor Engler issued Executive Order 1995–1, declaring that state agencies would not begin

providing voter registration services until "federal funds are made available to fully fund such purposes." Because Michigan refused to follow the directions for implementation of the Act, several Michigan residents sued for enforcement.

The first suit began when the Association of Community Organizations for Reform Now, commonly known as ACORN, the Kalamazoo Chapter of the Bertha Reynolds Society, Juan Cahue, and Joe Ziolkowski, filed suit against Michigan Secretary of State Candice Miller and Governor John Engler. Project Vote, another citizens group, later intervened in the ACORN case. Catherine LaPalm, Robert S. Hackett, Cass Corridor Neighborhood Development Corporation, and Westside Mothers (the "LaPalm plaintiffs") filed a similar but separate claim. The United States filed a third suit, also alleging that Michigan violated the Act. The district court consolidated the claims, and the plaintiffs sought (1) a declaration that the defendants (referred to collectively as "Michigan") were not in compliance with the Act, and (2) an order compelling compliance. Michigan, on the other hand, argued both that the Act violates the Tenth Amendment to the United States Constitution and that all plaintiffs, with the exception of ACORN, were precluded from maintaining their claims for failure to meet the notice requirements of 42 U.S.C. § 1973gg–9(b).

On December 13, 1995, the district court issued an opinion upholding the various plaintiffs' rights to maintain claims against Michigan and the constitutionality of the Act. *Association of Comm. Org. for Reform Now v. Miller*, 912 F.Supp. 976 (W.D.Mich.1995). The district court also ordered Michigan to comply with the Act. Initially, the court ordered Michigan to file and serve within ten days of the order a proposed plan for implementing the Act, including a date by which Michigan would be in full compliance. On December 27, Michigan filed a plan that stated that compliance could be achieved within 180 days of the court's approval. The following day, the court issued an order directing Michigan to explain why compliance could not be achieved by January 22, 1996, and setting oral argument on the subject for Jan-

uary 12, 1996. On January 17, following oral arguments, the court issued another order setting a compliance date of no later than February 1, 1996. *Association of Comm. Org. for Reform Now v. Miller,* 912 F.Supp. 989 (W.D.Mich.1996). On February 7, 1996, Michigan filed a Notice of Appeal to this Court.

■ Because the issues on appeal raise questions of law and statutory interpretation, we review the district court's determinations under a de novo standard. *United States v. Baro,* 15 F.3d 563, 566 (6th Cir.1994); *In re First Truck Lines, Inc. v. Noland,* 48 F.3d 210, 213 (6th Cir.1995).

## II

■ On appeal, Michigan challenges the constitutionality of the Act, arguing that in passing the Act, Congress overstepped its power to regulate federal elections by compelling state legislation to effectuate a federal program, directing states to legislate toward a federal purpose, and forcing states to bear the financial burden of enacting a federal scheme.

Citing *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), Michigan claims that the Act is unconstitutional because it conscripts state agencies, personnel, and funds to further a federal purpose, thereby impinging upon basic principles of federalism and violating the Tenth Amendment.

Michigan bases its arguments on the finding in *New York* that "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the

States to require or prohibit those acts." *New York,* 505 U.S. at 166, 112 S.Ct. at 2423. We agree that, where Congress has merely been granted the authority to require or prohibit a certain act, Congress may not exercise its authority by forcing state legislation. We also recognize, however, a distinction in how Congress can exercise each of its powers in question in the *New York* case, and in the case at hand. The *New York* Court addressed a challenge to a Congressional exercise of its power under the Commerce Clause—a power that enables Congress only to *make* laws affecting the states. In the case at hand, we are addressing a challenge to a Congressional exercise of its power to regulate federal elections—a power that enables Congress both to *make and alter* laws affecting the states with regard to this issue.

Congress enacted the National Voter Registration Act under the authority granted it in Article I section 4 of the Constitution, which provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.[1]

Article I section 4 explicitly grants Congress the authority either to "make" laws regarding federal elections (similar to the authority granted in the Commerce Clause), or to "alter" the laws initially promulgated by the states. Thus, unlike the Commerce Clause at issue in *New York,* Article I section 4 specifically grants Congress the authority to force states to alter their regulations regarding federal elections.[2]

---

1. While Article I section 4 mentions only the election of Senators and Representatives, Congress has been granted authority to regulate presidential elections, *Burroughs v. United States,* 290 U.S. 534, 545, 54 S.Ct. 287, 290, 78 L.Ed. 484 (1934), and party primaries involving federal congressional positions, *United States v. Classic,* 313 U.S. 299, 317, 61 S.Ct. 1031, 1038–39, 85 L.Ed. 1368 (1941).

2. Although Article I section 4 does not specifically mention voter registration requirements, the Court recognized in *Smiley v. Holm,* 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), the

authority of Congress to regulate voter registration procedures, by virtue of its power to control the "manner" of holding elections. The Court explained that the power to control the "times, places, and manner" necessarily included:

> a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows

Michigan also argues that, even if Congress has the authority to force state legislation regarding federal elections, Congress must bear the financial burden of its mandate. In *New York,* the Court recognized that, where Congress lacks the power to force states directly to enact certain legislation, Congress may exercise its spending power and indirectly encourage the desired state action by offering financial incentives. *New York,* 505 U.S. at 166–67, 112 S.Ct. at 2423–24. Apparently Michigan urges the negative inference of this rule: where Congress does not offer financial incentives, it may not force the states to act. However, as we recognized above, Michigan's argument misconstrues the nature of Congress's authority. Article I section 4 explicitly grants Congress the authority to force states to alter their regulations regarding federal regulations, and does not condition its grant of authority on federal reimbursement. While Congress could have decided to induce state compliance by offering financial incentives, it was not required to do so under Article I section 4.

Requiring federal reimbursement would alter the language of Article I section 4, and negate its effectiveness. Article I section 4 initially entrusts to the states the duty of determining the time, place and manner of conducting federal elections. But the duty assigned to the states is not simply the obligation to enact *any* method of conducting federal elections. If Congress determines that the voting requirements established by a state do not sufficiently protect the right to vote, it may force the state to alter its regulations. In mandating such a change, Congress would be acting under its express authority under Article 1 section 4 to alter state legislation as a means of regulating federal elections. In doing so, Congress would merely be requiring a state to do that which it should have done prior to congressional intervention. *See Colegrove v. Green,* 328 U.S. 549, 554, 66 S.Ct. 1198, 1200–01, 90 L.Ed. 1432 (1946) ("the Constitution has conferred upon Congress exclusive authority to secure fair representation by the States in the popular House and left to that House determination whether States have fulfilled their responsibility"). When Congress forces the states to shoulder a burden that they rightfully should have accepted without congressional intervention, Congress will not be required to bear the cost of such intervention.

As a final matter, the Act does not unconstitutionally impinge upon Michigan's sovereignty by affecting state election procedures. Although the registration obligations imposed by the Act will likely affect registration procedures associated with state and local elections, this result will arise as a matter of convenience and not because the Act requires it. Nothing in the Act prohibits a state from adopting separate registration requirements for the election of state officials.

 We now turn to Michigan's contention that the claims by all non-ACORN plaintiffs should be dismissed for non-compliance with 42 U.S.C. § 1973gg–9(b),[3] the Act's notice provision. Michigan's argument with respect to the United States fails because the statute does not require the Attorney General to give notice before filing suit for declara-

are necessary in order to enforce the fundamental right involved.
*Id.* at 366, 52 S.Ct. at 399.

3. 42 U.S.C. § 1973gg–9 provides, in relevant part:
(a) Attorney General
The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this subchapter.
(b) Private right of action
(1) A person who is aggrieved by a violation of this subchapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.
(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

tory or injunctive relief. 42 U.S.C. § 1973gg–9(a). Michigan's attempt to dismiss Project Vote from the suit also fails. Project Vote intervened in the ACORN suit, and, as the statute pertains to those who *initiate* suits, the notice provision in section 1973gg–9(b) does not apply to Project Vote.

 Finally, Michigan seeks dismissal of the LaPalm plaintiffs for failure to comply with the notice provision. Although these plaintiffs do not dispute Michigan's charge that they failed to provide notice, their suits will not be dismissed on that ground. Requiring these plaintiffs to give actual notice would have been unnecessary with regard to the purpose of the notice requirement. The language and legislative history of 42 U.S.C. § 1973gg–9(b) indicate that Congress structured the notice requirement in such a way that notice would provide states in violation of the Act an opportunity to attempt compliance before facing litigation. Senate Comm. on Rules and Admin., National Voter Registration Act of 1993, S.Rep. No. 6, 103d Cong., 1st Sess. 41 (1993).

In this case, Michigan had already received actual notice from ACORN, and already made clear its refusal to comply with the Act until "federal funds [were] made available to fully fund" the program. Michigan's stance as enunciated in Order 1995–1 and its failure to come into compliance despite ACORN's complaints (which were made in compliance with the statutory notice provisions and prior to the suit filed by these plaintiffs) clearly indicate that Michigan would continue to refuse to comply with the Act until forced to do so by judicial intervention. Michigan Governor Engler issued Order 1995–1 for the clear purpose of officially refusing to comply with the congressional mandate. Under the facts of this case, we agree with the district court that requiring these plaintiffs to file individual notice where Michigan had already ignored ACORN's actual notice amounts to requiring performance of futile acts. For the same reason, the LaPalm plaintiffs should remain a party to the action.

For the reasons above, we AFFIRM the district court's orders upholding the constitutionality of the National Voter Registration Act, requiring defendants' compliance with the Act, and allowing all plaintiffs to maintain their claims.

## CONCURRENCE

ALAN E. NORRIS, Circuit Judge, concurring.

I concur in the result.