EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carlos Zenón, et als.<br>Demandantes-Recurridos<br><br>v.<br><br>Juan R. Melecio, Presidente, et als.<br>Demandados-Peticionarios | Certificación<br><br>2001 TSPR 151<br><br>155 DPR _____ |

Número del Caso: CT-2001-1


Fecha: 5/noviembre/2001


Oficina del Procurador General:
                              Lcda. Laura Lis López Roche
                              Procuradora General Auxiliar


Abogado del Lcdo. Tomás Rivera Schatz, Comisionado Electoral del P.N.P.:
                              Lcdo. Luis F. Estrella Martínez


Abogado de Juan R. Melecio, Presidente de la C.E.E.:
                              Lcdo. Ramón L. Walker Merino


Abogado del Lcdo. Carlos J. López Feliciano, Comisionado Electoral del P.P.D.:
                              Por Derecho Propio


Abogados de Carlos Zenón y otros:
                              Lcdo. José Juan Nazario de la Rosa
                              Lcdo. Pedro J. Varela Fernández
                              Lcdo. Carlos E. Gómez Menéndez


Materia: Certificación




        Este documento constituye un documento oficial del Tribunal Supremo que está
        sujeto a los cambios y correcciones del proceso de compilación y publicación
        oficial de las decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

Carlos Zenón
Pedro Zenón Encarnación
Cacimar Zenón Encarnación
Rafael Rivera Castaño
Carmelo Feliz Matta
Paul O'Leary
Miguel A. Vázquez
Antonio Corción                      CT 2001-1      Solicitud de
María A. Torres Román                               Certificación
Rosa H. García Torres
Regalado Miró Corcino
Sandra I. Reyes Echevarría

Demandantes-Recurridos

             v.

Juan R. Melecio, Presidente,
Lcdo. Carlos López, Comisionado
PPD; Pedro Figueroa, Comisionado
PNP; Damaris Mangual, Comisionada
PIP; Comisión Estatal de Elecciones;
Estado Libre Asociado de Puerto Rico

Demandados-Peticionarios

*****************************************

Opinión del Tribunal emitida por el Juez Presidente, señor Andréu García

San Juan, Puerto Rico, 5 de noviembre de 2001

   A instancias del Estado Libre Asociado de Puerto Rico (E.L.A.), expedimos auto de certificación mediante nuestra resolución del pasado 17 de octubre, respecto al recurso de apelación presentado por dicha parte ante el Tribunal de Circuito de Apelaciones (KLAN-2001-01022). A través de dicho recurso se impugna la Sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan, el día 15 de octubre de 2001, en la que se decretó la inconstitucionalidad de la Ley Núm. 423 de 27 de octubre de 2000, según enmendada por la Ley Núm. 457 de 28 de diciembre de 2000.

I.

   El 13 de septiembre de 2001 los demandantes, todos residentes y electores del Municipio de Vieques, presentaron una Petición de Entredicho Provisional, Interdicto Preliminar e *Injunction* Permanente y Sentencia Declaratoria, mediante la cual impugnan la constitucionalidad de la Ley Núm. 423 de 27 de octubre de 2000, según enmendada por la Ley Núm. 457 de 28 de diciembre de 2000.

   Los demandantes sostienen que dicha legislación infringe sus derechos al sufragio y a la libertad de expresión. Aducen, además, que discrimina en su contra por razón de su ideología política, invocando para tal alegación, las disposiciones del Art. II, Sec. 2 y el Art. VI, sec. 4 de la Constitución del E.L.A.; lo resuelto en Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445 (1993), P.A.C. v. E.L.A., Op. de 25 de febrero de 2000, 2000 TSPR 61, por cuanto la aludida Ley no contiene una tercera alternativa que incluya la opción

que prevaleció en la consulta local celebrada en Vieques el 29 de julio de 2001; esto es, la terminación inmediata y permanente de las prácticas militares y bombardeos de la Marina de Guerra de los Estados Unidos en Vieques, la salida inmediata de la Marina, y la limpieza y devolución de las tierras viequenses a sus ciudadanos.

En particular, la petición argumenta que: (a) la celebración del referéndum federal requiere el desembolso de fondos públicos estatales de una manera vedada por la Sección 9 del Artículo VI de nuestra Constitución; (b) que en cuanto la Ley Habilitadora, no contiene una tercera alternativa que incluya la opción que mayoritariamente prevaleció en la consulta local celebrada en Vieques el 29 de julio de 2000, ésta les viola el derecho al voto, libertad de palabra, y discrimina contra ellos por razón de ideología política [§5.1-5.4]; y (c) que la Ley Habilitadora les viola el debido proceso de ley debido a cierta notificación inadecuada e incompleta [§7.1-7.15].

El tribunal de instancia celebró una audiencia el 21 de septiembre de 2001, durante la cual las partes sometieron un escrito en conjunto titulado Estipulaciones de Hechos y Documentos. Entre los hechos jurídicos estipulados por las partes está el siguiente: "La Oficina de Gerencia y Presupuesto del E.L.A. establecerá con la marina de los Estados Unidos los acuerdos necesarios para el reembolso de estos gastos". Dicha estipulación estaba acompañada de una carta de la Lcda. Melba Acosta, Directora de la Oficina de Gerencia y Presupuesto ("OGP"), a dichos efectos.

Los días 4 y 5 de octubre de 2001, se celebró una vista sobre la procedencia del entredicho preliminar para prohibir a la C.E.E. la impresión de las papeletas electorales a comenzar el 6 de octubre, y el tribunal emitió una Resolución y Orden paralizando todas las actividades de información, orientación e implantación del referéndum por parte de la Comisión Estatal de Elecciones (C.E.E.). La resolución del tribunal se fundamenta exclusivamente en la utilización de fondos estatales a manera de anticipo para subvencionar los costos del referéndum, aduciendo que el E.L.A. "no nos ha remitido a disposición legal o reglamentaria alguna de donde se derive la autoridad estatal en estas circunstancias para comprometer recursos públicos con miras a un futuro reembolso federal. Tampoco ha podido asegurar que ello en su día se produzca."

Entendiendo que dicha resolución estaba basada en la impugnación de un hecho no controvertido y estipulado por las partes, el 8 de octubre, el E.L.A. presentó una Moción de Reconsideración en la cual alegó que tal resolución descansaba en una premisa equivocada. En la referida moción se hizo constar que una vez comprometidos y asignados los fondos federales, era una cuestión ministerial gestionar su traspaso, y que la cuenta que se hacía a nombre de la C.E.E., mediante un anticipo, era simplemente una ficción de contabilidad que permitía el uso por adelantado de dichos fondos federales para implantar el referéndum. La moción señala que la Ley Pública 106-246 firmada por el Presidente Clinton el 13 de julio de 2000 ("Ley Inicial Asignando Fondos para Referéndum en Vieques") contiene disposiciones

para que de los cuarenta millones de dólares de asistencia a Vieques se puedan transferir y comprometer fondos para un sinnúmero de fines, entre los que se encuentra específicamente, que se lleve a cabo un referéndum para los residentes de Vieques. De igual manera, se acompañó una Declaración Jurada de la Lcda. Melba Acosta, Directora de la Oficina de Gerencia y Presupuesto, que relata las gestiones llevadas a cabo entre los gobiernos de Estados Unidos y Puerto Rico para tramitar la transferencia de los fondos y expresa que "nunca ha estado en tela de juicio las transferencias de fondos federales para sufragar los costos del referéndum contemplado bajo la Ley 423".

Al día siguiente, 9 de octubre, el E.L.A. presentó una moción supletoria, acompañando una carta del Comandante Kevin P. Green, del Comando Sur de las Fuerzas Navales de Estados Unidos, que reconoce la fuente congresional para el pago de los dineros para sufragar los costos del referéndum, y el compromiso de la Marina de Estados Unidos de así hacerlo, una vez se instrumenten los medios administrativos y logísticos para hacer la transferencia de fondos.

El 15 de octubre de 2001, el Tribunal de Primera Instancia finalmente emitió la Sentencia cuya revisión es el objeto de este recurso. Mediante nuestra resolución de 17 de octubre de 2001, notificada por facsímil ese mismo día, suspendimos los efectos de la orden de interdicto con el fin de que la C.E.E. reanudara los preparativos para llevar a cabo el referéndum el próximo 6 de noviembre de 2001. Concedimos, además, un término a las partes, a vencer dos días más tarde, para someter sus respectivos alegatos. El recurso quedó sometido para resolución en los méritos, el 19 de octubre de 2001, a las 4:30 de la tarde, después que las partes sometieron tales alegatos. No obstante, en esta última fecha los recurridos solicitaron la desestimación del recurso alegando que este Tribunal carecía de jurisdicción para entender en el mismo por razón de no haberse notificado de éste a los Comisionados Electorales del Partido Popular Democrático y del Partido Independentista Puertorriqueño. Concedido un nuevo término al E.L.A. para que se expresara sobre dicha moción, mediante nuestra resolución del pasado 24 de octubre, denegamos la misma.

El pasado 29 de octubre, el E.L.A. nos presentó una moción a los fines de informarnos de la decisión tomada por el Secretario de la Marina de posponer el referéndum para el 25 de enero de 2002. Asimismo, compareció nuevamente en esa misma fecha, la parte recurrida mediante un escrito titulado "Moción en Auxilio de la Jurisdicción" a los fines de solicitar la reconsideración de nuestra resolución de 17 de octubre de 2001, en cuanto dejó en suspenso el injunction permanente decretado por el tribunal de instancia, por razón de la presentación del P. de la C. 1939 hecha por varios miembros de la Cámara de Representantes, entre ellos su Presidente, para "conformar el asunto a presentarse en la consulta de los electores del Municipio de Vieques con lo dispuesto en la Ley Pública Núm. 106-398". Aducen los recurridos que "[c]onsiderando el proyecto de ley presentado, esta Honorable Curia no tendrá que pasar juicio ... respecto a si el Artículo 4 de la Ley Núm. 423 se conforma a

la Sección 1503(a)(1) de la Ley Pública Núm. 106-398 en cuanto al contenido de la consulta o de la papeleta que habrá de presentarse al electorado viequense...".

Mediante nuestra resolución del 30 de octubre de 2001, concedimos un término simultáneo a todas las partes, que venció el pasado 1ro. de noviembre para que se expresaran sobre la Moción Informativa del Procurador General y la Moción en Auxilio de la Jurisdicción de la parte recurrida. Habiendo comparecido las partes mediante escritos sobre este particular, por resolución separada emitida en el día de hoy hemos atendido el último de dichos escritos, declarando sin lugar la reconsideración solicitada en el mismo.

Estando, finalmente, en condición de resolver el presente recurso, procedemos a continuación a así hacerlo.

## II.

El 31 de enero de 2000, el ex presidente de los Estados Unidos de América, William J. Clinton, emitió una Orden Presidencial conteniendo unas directrices en torno a las actividades de la Marina en la Isla de Vieques. Tales directrices presidenciales establecían, *inter alia*, la celebración de un referéndum en Vieques, dirigido a que los viequenses se expresaran mediante la selección de una de dos opciones o alternativas, su parecer sobre las prácticas militares en esa isla. Éste debería llevarse a cabo dentro de los doscientos setenta (270) días previos o siguientes al 1 de mayo de 2001. La fecha exacta sería especificada por la Marina con por lo menos noventa (90) días de anticipación. Las alternativas a ser votadas en el referéndum, según expresadas en las directrices eran, la primera, el cese de las prácticas militares no más tarde del 1ro. de mayo de 2003 y la segunda, la continuación de los entrenamientos, incluyendo las prácticas militares con balas vivas, en los términos propuestos por la Marina, en próximas comunicaciones. La orden expresaba que la realización del referéndum dependía de la autorización, apoyo y cooperación del Gobierno de Puerto Rico. La implementación de las directrices, según se establecía específicamente en la orden, quedaba supeditada a que el Gobierno de Puerto Rico autorizara el referéndum y viabilizara el mismo de acuerdo a sus leyes y reglamentos electorales. Véase, 65 Fed. Reg. Vol. 24 pp. 5728, 5731 (2000).

El 13 de julio de 2000, el Congreso norteamericano aprobó la Ley Pública (Pub. L.) No. 106-246, (114 Stat 511), mediante la cual se asignó la suma de cuarenta millones de dólares, a ser transferidos a las agencias pertinentes del Gobierno de los Estados Unidos, para llevar a cabo los proyectos que se describen en la Ley relacionados a la Isla de Vieques, entre éstos, el referéndum para que los residentes de Vieques se expresaran acerca del uso futuro de la isla para propósitos militares. ("[F]urther use of the island for military purposes").

Así las cosas, el 27 de octubre de 2000, la Legislatura de Puerto Rico promulgó la Ley Núm. 423, a los efectos de viabilizar la implantación de las directrices presidenciales. Casi paralelamente, el 30 de octubre de 2000, el Congreso norteamericano aprobó la Pub.

L. No. 106-398 (114 Stat. 1654). El título XV[1] de esta ley trata en su mayoría sobre las actividades militares en Vieques. Provee para la celebración del mencionado referéndum y además establece los diferentes cursos de acción a seguir por el Presidente, de resultar escogida una u otra opción.

La Ley específicamente excluye otra propuesta u opción que no sea la aprobación o desaprobación de la continuación de los entrenamientos de la Marina según se describen en las subsecciones (a)(1) y (d) de esta Ley. (Sec. 1503(b)).

A los fines de aclarar varias de las disposiciones de la Ley 423, supra, y armonizarlas con las directrices presidenciales y la Ley Pública Núm. 106-398, el 28 de diciembre de 2000, la Asamblea Legislativa aprobó la Ley Núm. 457, que enmendó varios artículos de la Ley 423. Los electores registrados en el Municipio de Vieques debían seleccionar entre las dos opciones dispuestas en la Orden Presidencial de 31 de enero de 2000 y la Ley Pública 106-398, según se declaran en la Ley Núm. 457. Las opciones, según se establecen, son (1) el cese de los entrenamientos de la Marina no más tarde del 1 de mayo de 2003 y (2) la continuación de los entrenamientos, incluyendo entrenamiento utilizando municiones vivas, bajo los términos propuestos por la Marina.

El 11 de diciembre de 2000, el entonces Secretario de la Marina, Richard Danzig, le comunicó mediante carta al entonces Gobernador, Hon. Pedro Rosselló, la fecha del 6 de noviembre de 2001, como la fecha para llevarse a cabo el referéndum federal en el Municipio de Vieques. Además, expresó en dicha misiva que noventa (90) días antes de esa fecha, su oficina especificaría los términos para la opción número dos (2) en el referéndum, la cual permitiría los entrenamientos después de mayo de 2003.

---

[1] Los temas en torno a ese título eran los siguientes:

Title XV- Navy activities on the Island of Vieques, Puerto Rico.

Sec. 1501. Assistance for Economic Growth on Vieques.

Sec. 1502. Conveyance of Naval Ammunition Support Detachment, Vieques Island.

Sec. 1503. Determination Regarding continuation of Navy Training.

Sec. 1504. Actions if training is approved.

Sec. 1505. Requirements if training is not approved or mandate for referendum is vitiated.

Sec. 1506. Certain properties exempt from conveyance or Transfer

Sec. 1507. Moratorium on Improvements at Fort Buchanan.

Sec. 1508. Transfer and Management of Conservation Zones.

El 13 de junio de 2001, la Asamblea Legislativa de Puerto Rico aprobó la Ley Num. 34, a los fines de ofrecer una consulta bajo la Constitución y las leyes del E.L.A., independiente del referéndum pautado para el 6 de noviembre próximo. En ésta se ofrecería una tercera opción a las dos previamente estructuradas en las leyes federales, esto es, la terminación inmediata y permanente de los entrenamientos en la isla de Vieques. (Véase, Exposición de Motivos de la Ley Núm. 34). La consulta se celebró el 29 de julio de 2001, y la opción de terminación inmediata y permanente resultó victoriosa, alcanzando el 68.2 por ciento de los votos del pueblo viequense.

El 2 de agosto de 2001, Gordon England, Secretario de la Marina bajo la Administración del Presidente George W. Bush, apoyado en la autorización que a esos fines concedía la sección 1503 de la Ley Pública Núm. 106-398, mediante comunicación escrita informó a la Gobernadora, Hon. Sila M. Calderón, las condiciones en las que se llevarían cabo las prácticas militares en el Municipio de Vieques, de resultar favorecida la alternativa de continuación permanente de las prácticas militares con balas vivas. ("I have directed Kevin P. Green to work with your staff and the Commonwealth Elections Commission to incorporate these conditions into the ballot.")

La Gobernadora Calderón solicitó al Presidente de la C.E.E., Hon. Juan Melecio, que procediera con los trámites con relación al referéndum. Éste remitió comunicación a la Oficina de Gerencia y Presupuesto (OGP), solicitando el presupuesto para llevar cabo el evento electoral. La OGP le informó que el Gobierno Federal reembolsaría los fondos utilizados para financiar el evento, que serían adelantados por el Secretario de Hacienda. El 8 de septiembre de 2001, la C.E.E. publicó la proclama del referéndum a llevarse a cabo el 6 de noviembre de 2001[2]. Así las cosas, el pasado 13 de septiembre se presentó la acción de autos.

**III.**

El Tribunal de Primera Instancia concluyó que la Ley 423, según enmendada, es inconstitucional. El foro *a quo* fundamentó su decisión en que existen diferencias irreconciliables entre las directrices presidenciales y la Ley Pública Núm. 106-398, por lo que la ley local que las viabiliza, resulta del todo incompatible y por ende, viciada de inconstitucionalidad.

Aduce el aludido tribunal que a los electores viequenses se les estaría convocando para votar por dos alternativas, a pesar de que el estatuto federal sólo autoriza una opción exclusiva y mediante un formato igualmente exclusivo: la aprobación o desaprobación de la

---

[2] Como hemos mencionado, mediante la carta del Secretario de la Marina, Sr. Gordon England, de fecha 25 de octubre de 2001, éste comunicó a la Gobernadora, Hon. Sila M. Calderón, su decisión de posponer el referéndum para el 25 de enero de 2002.

continuación de las prácticas con bala viva y cualquier otro tipo de entrenamiento por las Fuerzas Armadas en las facilidades de entrenamiento de la Marina. Además sostiene que el evento que promulga la ley local resulta distinto a lo provisto por la Ley Pública 106-398, por cuanto no contempla un pronunciamiento previo del Presidente de los Estados Unidos convocando la celebración del mismo, además de que prescribe un componente de electores hábiles distinto a lo que informa aquélla, por lo que se estaría financiando un evento con fondos públicos, en clara violación al estatuto que lo habilita y a ciertas disposiciones constitucionales específicas. Según el tribunal, la ausencia de fondos federales para sufragar el referéndum y descartado el fin legítimo del mismo, hacen que dicho evento electoral carezca de consecuencia jurídica. Expresa que sostener la celebración de un evento electoral que entraña tales inconsistencias con el estatuto del que reclama su procedencia, no salvaguarda el derecho fundamental de los electores de emitir un voto libre y eficaz.

Concluye que con las mencionadas actuaciones se han violado el Art. VI, Sec. 9 de nuestra Constitución que prohíbe la utilización de fondos públicos para fines que no sean públicos; el derecho al voto según se consagra en el Art. II, Sec. 2; el derecho a la inviolabilidad de la dignidad del ser humano del Art. II, Sec. 1 y al de un debido proceso de ley, Art. II Sec. 7.

Conforme al Art. 22 de la propia Ley 423, según enmendada por la Ley 457, que dispone que será declarada inconstitucional la totalidad del estatuto en caso de la declaración de inconstitucionalidad de alguno de sus artículos, el tribunal *a quo* decretó la total inconstitucionalidad de la misma.

La sentencia de instancia intima que la Ley Pública 106-398 tuvo el efecto de limitar la consulta a básicamente la segunda de las alternativas, esto es, la continuación de los entrenamientos, mediante una votación de aprobación o desaprobación de los mismos. La sentencia concluye además, que varias de las disposiciones contenidas en las directrices presidenciales no se incluyeron más adelante en la Ley 106-398 y que en ningún lugar de la misma se hace referencia alguna a las directrices contenidas en la Orden Presidencial como documento jurídico suplementario. Según pronunció el tribunal de instancia, la ley posterior del Congreso federal se convirtió en fuente normativa y rectora, modificando en tal forma las directrices que, al parecer, ambas no pueden subsistir. Al ser el mismo Presidente Clinton autor de la Orden Presidencial, el que firma la referida Ley, le permite inferir a dicho tribunal que el Presidente prestó su anuencia para alterar los términos previstos en sus propias directrices y modificar el estado de derecho vigente.

**IV.**

La decisión del tribunal sentenciador descansa sobre la premisa equivocada de que la Ley 423, según enmendada, cumple con las directrices presidenciales pero no cumple con la Ley Pública 106-398, que por ser posterior, ocupó el campo, y que no hay forma de conciliar ambas leyes. La premisa inarticulada de esta posición es que al no seguir la letra del

estatuto federal, la erogación de fondos por los Estados Unidos que establece la Ley 106-398 no se va a materializar, por lo que el gobierno del Estado Libre Asociado de Puerto Rico estaría erogando fondos públicos para una consulta local que no cumple con los requisitos de la federal la cual, a su vez, no contiene la fórmula ya favorecida por el electorado viequense en el referéndum celebrado anteriormente, por lo que no hay un fin público legítimo. Erró dicho tribunal al así decidir.

Ciertamente, las palabras utilizadas en las directrices presidenciales y en la Ley Pública No. 106-398, en cuanto a las alternativas que se han de presentar al pueblo viequense, no son las mismas. Pero cabe preguntarse ¿resultan tan diametralmente distintas a lo intimado, tanto en substancia como en sus fines y medios, como para viciar de inconstitucionalidad el proceso que nos ocupa? Estimamos que no.

Las directrices presidenciales[3] ordenaban la celebración de un referéndum para presentarle al pueblo viequense las siguientes opciones: (1) el cese de los entrenamientos de la Marina no más tarde del 1 de mayo de 2003; y (2) la continuación de los entrenamientos, incluyendo la utilización de municiones vivas, bajo los términos propuestos por la Marina. La Ley Pública No. 106-398[4] provee la celebración de un referéndum donde los susodichos

---

[3] Directive to the Secretary of Defense, Director Office Management and Budget
Subject- Resolution Regarding Use of Range Facilities on Vieques, Puerto Rico (Referendum) […]

1. The future of Navy training on Vieques will be determined by a referendum of the registered voters of Vieques, using Puerto Rico electoral laws and regulations as they exist as the date of this directive. […]

2. This referendum will present two alternatives. The first shall be that the Navy will cease all training not later than May 1. 2003. The second will permit continued training, to include live fire training, on terms proposed by the Navy. […]

[4] Sec. 1503 Determination regarding continuation of Navy Training

(a) Referendum—

(1) Requirement- Except for provided in paragraph (2) the President shall provide for a referendum to be conducted on the Island of Vieques, Puerto Rico, to determine by a majority of the votes cast in the referendum by the Vieques electorate whether the people of Vieques approve or disapprove of the continuation of the conduct of live-fire training, and any other types of training, by the Armed Forces at the Navy's training sites on the island under the conditions described in subsection (d). […]

(d) Require training conditions- For the purposes of the referendum under this section, the conditions for the continuation of the conduct of training are those that are proposed by the Secretary of the Navy and publicized on the island of Vieques in connection with, and for a reasonable period in advance of, the referendum. The conditions shall include the following:

(1) Live-fire training- A condition that the training may include live-fire training.

electores deben de escoger entre las alternativas de aprobar o no aprobar la continuación de los ejercicios militares con bala viva y otros tipos de entrenamiento. Por tanto, un voto mayoritario a favor de la segunda de dichas alternativas equivale a una votación por la no continuación o descontinuación de los ejercicios militares, lo que equivale a una expresión a favor de la finalización, detención o el cese de los entrenamientos de la Marina de Guerra de los Estados Unidos en la isla municipio de Vieques. Esta ley federal también dispone sobre las consecuencias de que se escojan una u otra alternativa (aprobación o desaprobación de la continuación de los ejercicios, de la forma en que la Marina establezca). Específicamente determina cuál será la actuación del Presidente de los Estados Unidos en uno u otro caso[5].

La Ley 423, según enmendada, se promulgó para viabilizar la celebración de un referéndum en Vieques, según contemplado tanto por las directrices como por la Ley Pública No. 106-398. Aunque utilizó el lenguaje de la Orden Presidencial en cuanto a la estructura o configuración de las alternativas, utilizó el lenguaje de la Ley 106-398 en cuanto a sus consecuencias, inclusiones, resultados y disposición[6].

Esencialmente nos encontramos ante dos fuentes legales (una ley y una orden presidencial) que contemplan ambas la creación de un referéndum para que el pueblo viequense se exprese sobre las actividades de la Marina de Guerra de los Estados Unidos en la Isla

---

> (2)    Maximum annual days of use– A condition that the training may be conducted on not more than 90 days each year.
> (3)

[5] Véanse, Sec. 104 (Actions if training is approved) y Sec. 1505 (Requirements if training is not approved or mandate for referendum is vitiated.) Ley No. 106-398.

[6] El Art. 4 de la Ley 423, según enmendada por la Ley 457, supra, establece que en las papeletas aparecerán impresas las siguientes dos alternativas:

(1) En la parte superior de la columna izquierda aparecerá impreso "Cese de los entrenamientos de la Marina en Vieques/Navy will cease all training in Vieques; seguido, en párrafo aparte y en los idiomas español e inglés, de lo siguiente:  "El cese de toda práctica militar en o antes del 1 de mayo de 2003. La transferencia de las tierras de la Marina de los Estados Unidos en toda la zona este de Vieques se hará a la jurisdicción administrativa del Secretario de lo Interior, quien retendrá y administrará dichos terrenos hasta que se apruebe una ley que estatuya lo pertinente a la disposición de dichas propiedades.  El Gobierno Federal estará obligado a mitigar los daños ambientales según la directriz presidencial.  De ninguna forma esta propiedad podrá ser destinada en un futuro para uso por el Departamento de la Defensa a uso militar alguno."

(2) En la parte superior de la columna derecha aparecerá impreso "Continuación de los entrenamientos de la Marina en Vieques/ Continued Navy training on Vieques; seguido en párrafo aparte y en los idiomas español e inglés de lo siguiente: La Marina de los Estados Unidos continuará llevando a cabo entrenamientos en Vieques utilizando balas vivas. Los ciudadanos de Vieques recibirán ayuda económica para ellos y sus comunidades de unos cincuenta millones (50,000,000.00) de dólares que han sido autorizados para destinarse al Presidente para tales fines, además de una cantidad de cuarenta millones (40,000,000.00) de dólares según autorizado por la Ley Pública 106-398 de 30 de octubre de 2000.

de Vieques. Las opciones que se delinean en ambas son conceptualmente correspondientes: la primera negativa a la permanencia de este cuerpo naval, la segunda positiva a esa permanencia.

El Tribunal de Primera Instancia entendió que la Ley 106-398 ofrecía al electorado una sola opción mientras que las directrices y la Ley 423 local ofrecían dos alternativas. No podemos refrendar esa conclusión. El análisis de ambas leyes nos lleva a concluir sin lugar a dudas, que los electores habrán de elegir entre dos opciones, la continuación o el cese de las prácticas de la Marina. Sólo esa conclusión es posible cuando surgen detalladamente del estatuto federal los cursos de acción a seguir por el Presidente y el Secretario de la Defensa en caso de que los electores viequenses elijan una u otra opción. Véase Secs. 1504 -1505, supra. La sección 1505 (b)(1) establece que de ser escogida la opción del cese de los entrenamientos militares, ("requirements if training is not approved"), el Secretario de la Defensa finalizará toda operación de entrenamiento militar ("all Navy and Marine Corps") en Vieques no más tarde del 1ro. de mayo de 2003.

La disposición de la Sección 1503(b) a los efectos de que el electorado sólo podrá evaluar las opciones de aprobar o desaprobar las prácticas de la Marina[7] no queda afectada por el hecho de que la Ley 423, según enmendada por la 457, supra, disponga que cada papeleta contenga una explicación del alcance y las consecuencias de cada opción según surgen de las claras disposiciones de la Ley Pública 106-398. Dicho estatuto federal nada provee que sea contrario a esos efectos.

La sentencia del Tribunal de Primera Instancia articula además, que la Ley 106-398 en su sección 1503[8] dispone que el Presidente convocará el referéndum y que no ha habido tal convocatoria. El Procurador General sostiene que el Presidente convocó el referéndum a través del Secretario de la Marina.

La disposición de la Ley 1503(a) requiere que el Presidente provea ("shall provide for") o viabilice una consulta a los viequenses y a esos fines le impone un deber ministerial. Pero no requiere que sea a través de un documento específico como, a modo de comparación, el que le impone al Presidente en su sección 1503(e)[9], para determinar, y emitir una proclama

---

[7] "[N]o proposition or option may be presented as an alternative to the propositions of approval or
disapproval on the continuation of the conduct of training as described in subsection (a)(1)".

[8] Sec. 1503 Determination regarding continuation of Navy Training

(a) Referendum

(1) Requirement- Except for provided in paragraph (2) the **President shall provide** for a referendum to be conducted on the Island of Vieques, Puerto Rico[…](Énfasis suplido)

[9] (e) Proclamation of outcome- Promptly after the referendum is completed under this section, the

anunciando el resultado (desenlace) del referéndum. Tanto la administración del Presidente Clinton como la del Presidente Bush han cumplido con el deber impuesto por la Ley Pública 106-398, supra, los que a través de los organismos concernidos han continuado realizando gestiones afirmativas a los efectos de promover el referéndum.

**V.**

El Tribunal de Primera Instancia aduce como razón adicional a su decisión que la ley 423 aporta una definición distinta de electores hábiles al que establece la ley federal. A ello riposta el señor Procurador General que la definición de electores hábiles bajo la Ley 106-398 es compatible con la definición de electores bajo el estatuto local.

La ley federal contempla que los electores en el referéndum serán (1) residentes de Vieques (2) que aparezcan registrados para votar en una elección general –autorizados para votar por el Comisionado Residente del E.L.A.– a las fechas especificadas en el párrafo 2 (esto es, 7 de noviembre del 2000 [y/o] aquella fecha que sea 180 días antes de la fecha en que se llevará a cabo el referéndum). Ley Pública 106-398 § 1503(f). Esa fecha se cumplía el 6 de mayo de 2001.

Por otro lado, la Ley 423, según enmendada, supra, en su Art. 7, dispone que los electores serán: (1) electores bonafide del Municipio de Vieques, debidamente calificados como tales conforme a las disposiciones, fechas límites y términos de la Ley Electoral de Puerto Rico y sus Reglamentos. "La Comisión Estatal de Elecciones incluirá en la lista de votantes a todos aquellos electores con récord activo que a la fecha del referéndum hayan cumplido dieciocho (18) años de edad y formen parte del registro electoral de Vieques, de conformidad con las disposiciones, fechas límites y términos de la Ley Electoral de Puerto Rico y sus Reglamentos. Toda solicitud de transacción electoral en Vieques, después de las elecciones generales del 7 de noviembre de 2000, y hasta la fecha en que se celebre el referéndum dispuesto en esta Ley, deberá hacerse mediante declaración jurada so pena de perjurio, ante notario público pagado y designado por la C.E.E. en la Junta de Inscripción permanente de Vieques. [...]" Ley 423, según enmendada por la Ley 457.

Tiene razón el Procurador General al aducir que ambas definiciones son compatibles. Como bien sostiene éste, al amparo de la Ley Electoral de Puerto Rico sólo tienen derecho a votar en una elección aquellos electores que figuren en el Registro de Electores. Véase 16 L.P.R.A. § 3203. Éstos son aquellos que participaron en la última elección general anterior a los comicios en cuestión, y los que se hayan inscrito en el Registro Electoral posteriormente a través de los mecanismos provistos por la C.E.E. En el caso de los electores viequenses, la C.E.E. acordó que, además de los electores que figuren en el Registro de Electores al 7 de noviembre de 2000, según contempla el estatuto federal, tendrán derecho

---

President shall determine, and issue a proclamation declaring the outcome of the referendum.  The President's determination shall be final, and the outcome of the referendum (as so determined) shall be binding.

a votar en el referéndum sobre el futuro de los ejercicios de la Marina los electores debidamente inscritos y activos en el Registro Electoral al 7 de octubre de 2001, o sea treinta (30) días antes de dicho referéndum, y que a la fecha del referéndum hayan cumplido 18 años de edad.  Mediante el referido acuerdo podrán también votar aquellos electores que votaron en el referéndum celebrado el pasado 29 de julio, aunque no hubieran votado en las elecciones generales del pasado 6 de noviembre. Véase 16 L.P.R.A. § 3003(52), 3062.   En resumen, estarán inscritos, y por lo tanto activos en el Registro Electoral de Vieques: (i) los electores que votaron en las elecciones generales del 2000 (hayan votado o no en el referéndum de julio); (ii) los que votaron en el referéndum de julio pasado (hayan votado o no en las elecciones generales del 2000); (iii) los que se hayan inscrito después del referéndum celebrado en julio, pero en o antes del 7 de octubre de 2001.

Aunque el estatuto federal sólo contempla que los electores sean residentes de Vieques y que estén registrados al 7 de noviembre de 2000, conforme a la Ley Electoral vigente, la Ley 423 incluye a los electores previstos por la ley federal, pero es aún más abarcadora que ésta, ya que permite que los electores activados después del 6 de mayo de 2001 (180 días antes) participen también en el referéndum.  No existiendo una disposición federal en contrario, el derecho electoral aplicable en el referéndum es la Ley Electoral de Puerto Rico, por disposición expresa de la Ley 423 y por la directriz presidencial de 31 de enero de 2000.    Según expresa el señor Procurador, ello es consistente con la tradición norteamericana de que los comicios federales se organicen bajo las leyes electorales de los distintos estados. Ex Parte Yarbrough, 110 U.S. 651 (1884); Gray v. Sanders, 372 U.S. 368, 379 (1963); Katzenbach v. Morgan, 384 U.S. 641, 647 (1966).

> The methods by which the people of Puerto Rico and their representatives have chosen to structure the Commonwealth's electoral system are entitled to substantial deference.  Rodríguez v. Popular Democratic Party, 457 U.S. 1, 8 (1982).

> Absent some clear constitutional limitation, Puerto Rico is free to structure its political system to meet its 'special concerns and political circumstances'. Rodríguez v. Popular Democratic Party, supra, pág. 13 (1982).

Como dijimos en Ramírez de Ferrer v. Mari Bras, 144 D.P.R. 141, 171 (1997), "el E.L.A. tiene, cuando menos, los mismos poderes legislativos que un estado de la Unión [en cuanto [a]l  poder de reglamentar el sufragio en el país."

Conforme a la doctrina constitucional norteamericana, el derecho a votar libremente en Puerto Rico constituye un derecho político fundamental.  Veáse Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84, 88, donde citamos lo siguiente:

> "...la tarea primordial de la revisión judicial es la remoción de obstrucciones en el proceso democrático.  La denegación del voto parece ser la quinta esencia de esas obstrucciones." John Hart Ely, Democracy and Distrust: A Theory of Judicial Review, Cambridge, Mass., Harvard U. Press, 1980, pág. 117.

En _Dunn v. Blumstein_, 405 U.S. 330 (1972), el Tribunal Supremo de los Estados Unidos invalidó, expresamente, un estatuto de Tennessee que imponía, como condición para votar, el requisito de haber residido en el estado un año y en el condado tres meses, inmediatamente antes de las elecciones, al concluir que el mismo violaba la igual protección de las leyes. El Tribunal estimó que no existía un interés apremiante del Estado en imponer términos tan largos. A la luz de dicha opinión, el Tribunal Supremo de los Estados Unidos resolvió los casos de _Ferguson v. Williams,_ 405 U.S. 1036 (1972); _Marston v. Levis_, 410 U.S. 679 (1973), y _Burns v. Fortson_, 410 U.S. 686 (1973), en los cuales enfrentó _el problema de la fecha apropiada para el cierre de las inscripciones_. En _Ferguson v. Williams_, supra, el Tribunal dejó sin efecto un fallo de un tribunal de tres jueces que resolvió que era válido constitucionalmente el cierre de las inscripciones cuatro meses antes de la elección y devolvió el caso a instancia para su consideración a la luz del caso de _Dunn._ Aunque, tanto en _Marston v. Levis_, supra, como en _Burns v. Fortson_, supra, el Tribunal Supremo Federal resolvió que sendos términos de cincuenta días entre la última fecha de inscripción y el evento electoral, eran permisibles desde el punto de vista constitucional, en éste último expresó que tal período "se acerca a los linderos constitucionales extremos en este campo ...", op. cit. Pág. 687.

Es conforme a dicha jurisprudencia federal que en 1980, resolvimos el caso de _Ortiz Angleró v. Barreto Pérez_, supra. En la opinión que emitiéramos en ese caso por voz del entonces Juez Presidente, señor Trías Monge, luego de hacer un recuento de los casos federales sobre el particular, llegamos a la conclusión de que una Resolución Conjunta que disponía un término de 153 días entre el cierre de las inscripciones y la fecha de celebración de un referéndum para enmendar nuestra Constitución a los fines de limitar el derecho a fianza, era inconstitucional por restringir irrazonablemente el acceso de los electores al Registro Electoral a los fines de participar en dicho referéndum.

Por tanto, tenemos que necesariamente concluir, por ser inescapable dicha conclusión conforme tanto a la doctrina federal como a la nuestra, según han quedado éstas reseñadas, que el estatuto federal que provee para la celebración del referéndum del 6 de noviembre, establece un punto de partida como requisito mínimo que no impide a la Asamblea Legislativa de Puerto Rico adoptar, como en efecto adoptó por medio de la Ley 423, una medida que garantiza plenamente el derecho al sufragio a un mayor número de votantes legalmente cualificados salvando de este modo cualquier defecto constitucional que hubiera podido oponerse al estatuto federal.

El hecho de que el estatuto local permita la participación de un mayor número de electores bona fide que los previstos en el estatuto federal, no puede ser razón para declararlo nulo, y por ende, decretar la suspensión del referéndum, como tampoco puede interpretarse para socavar la obligatoriedad de los resultados de dicha consulta electoral. Por el contrario, el estatuto local propende a garantizar una mayor confiabilidad al evento

electoral de marras por lo que no podemos discernir conflicto sustancial alguno entre ambos estatutos en este sentido.

**VI.**

El Art. 21 de la Ley 423, según enmendada, dispone que el Congreso de los Estados Unidos asignará fondos federales para llevar a cabo el referéndum. Por tanto, el Tribunal de Primera Instancia concluyó que la celebración del referéndum mediante la utilización de fondos del Estado Libre Asociado, no solo constituye una violación a la Ley 423, supra, sino que infringe el Art. VI, Sec. 9 de nuestra Constitución.

La Ley Pública Núm. 106-246 (114 Stat 115) de 13 de julio de 2000, en su sección sobre "Operation Maintenance, Defense-Wide" ("including transfer of funds") asignó la cantidad de cuarenta millones (40,000,000) de dólares a la Marina para que sean destinados a ciertos usos específicos con relación a Vieques, entre los que se detalla "... and conducting a referendum for among the residents [of] Vieques regarding further use of the island for military training programs". Esta asignación de fondos ha sido reconocida en leyes posteriores. Ley Pública Núm. 106-398, supra. Surge de los autos que las partes estipularon ante el Tribunal de Primera Instancia que el Secretario de Hacienda adelantará la cantidad de seiscientos setenta y tres mil (673,000) dólares a la C.E.E. y la Oficina de Gerencia y Presupuesto del E.L.A. establecerá con la Marina de los Estados Unidos los acuerdos necesarios para el reembolso de esta cantidad. Mediante comunicación escrita de 5 de septiembre de 2001, a la Gobernadora de Puerto Rico, Hon. Sila M. Calderón, con copia al Hon. Juan R. Melecio, el Comandante Kevin P. Green, de la Marina de los Estados Unidos, detalló varias de las iniciativas preparatorias para el evento electoral y reiteró la disposición del gobierno federal de aportar los fondos. La transferencia de fondos federales mediante el método de reembolso es un mecanismo común en las relaciones entre las autoridades federales y el Gobierno de Puerto Rico. Consecuentemente, no le asiste la razón al Tribunal de Instancia al concluir que el mencionado referéndum será costeado con fondos del Estado Libre Asociado.

No podemos estar ajenos al hecho de que el estatuto impugnado fue aprobado con el propósito de viabilizar la consulta solicitada por el Gobierno Federal. Tampoco podemos ignorar que, para ofrecer a los residentes de Vieques la oportunidad de expresarse sobre una opción que no fue incluida por el Congreso de los Estados Unidos en el estatuto que provee para el próximo referéndum, se aprobó por la Legislatura de Puerto Rico, la Ley Núm. 34 de 13 de junio de 2001, que culminó en el proceso de votación del 29 de julio de 2000, con el resultado de que la referida opción obtuvo la mayoría de los votos. El referéndum a ser celebrado en el próximo mes de noviembre fue gestionado por el Gobierno Federal y

va a ser financiado, en última instancia, con fondos federales ya separados para esos efectos. Por tanto, no es necesario extendernos para concluir que incidió el tribunal sentenciador al concluir que habrán de utilizarse fondos del Estado Libre Asociado para financiar una actividad carente de un fin público. Ambas premisas son erróneas.

El interés del Estado al aprobar esta legislación que viabiliza el referéndum es legítimo y apremiante, al ofrecerle a los viequenses la oportunidad de decidir si desean que la Marina venga obligada a cesar los ejercicios bélicos en o antes del 1 de mayo de 2003. Las dos opciones son las únicas que está dispuesto a aceptar el Congreso. La legislación ahora impugnada no persigue auscultar la opinión del electorado de Vieques respecto a otras opciones, como fue el propósito de la Ley Núm. 34, supra, sino adoptar los parámetros provistos por la ley federal. Forzoso es también concluir que el evidente propósito que la Ley 423, supra, constituye un fin eminentemente público.

**VII.**

Por último, alegan los demandantes recurridos que conforme resolvimos en Sánchez y Colón v. E.L.A. I & II, 134 D.P.R. 445 (1993) y 134 D.P.R. 503 (1993), la ley 423, según enmendada, es inconstitucional por no incluir la opción que ellos favorecen. Sánchez, supra, es distinguible del caso de autos; allí el referéndum trataba de fórmulas de *status* político, razón por la cual aplicamos un escrutinio riguroso ya que involucraba el derecho del pueblo a definir su relación política con Estados Unidos. La Ley 423 sólo fue aprobada para viabilizar la consulta prevista en el estatuto federal; es este último el que elabora los aspectos sustantivos de la consulta.

La Legislatura goza de amplia facultad para reglamentar los eventos electorales y ello, por su naturaleza, tiene el efecto de "restringir e imponer cargas sobre el derecho a participar en el evento electoral". Según hemos señalado, el interés del Estado no es el de auscultar el sentir de los viequenses respecto a todas las posibles alternativas para solucionar el conflicto entre los residentes de Vieques y la Marina. Los demandantes recurridos ya tuvieron la oportunidad de expresarse al votar sobre la opción de su preferencia en el referéndum celebrado el pasado 29 de julio al amparo de las disposiciones de la Ley Núm. 34, supra. Como ha quedado dicho, el estatuto local impugnado pretende habilitar el referéndum contemplado por la ley federal con el propósito de decidir específicamente si la Marina ha de continuar o no sus ejercicios bélicos después del 1ro. de mayo de 2003.

**VIII.**

Las demás alegaciones contenidas en la petición presentada por los demandantes recurridos ante el tribunal de instancia se han tornado académicas. Estas se limitan a señalar que la Comisión Estatal de Elecciones les privó del debido proceso de ley al no publicar una proclama para anunciar el referéndum con sesenta (60) días de antelación a la fecha de su celebración (Art. 7); y que la C.E.E. no comenzó una campaña de orientación

cincuenta y cinco (55) días antes del referéndum (Art. 8). Ante la decisión tomada por el señor Secretario de la Marina de posponer para el 25 de enero próximo dicha consulta electoral, no es necesario entrar a considerar tales alegaciones.

IX.

De conformidad con lo resuelto anteriormente, se dictará sentencia para revocar aquella dictada por el Tribunal de Primera Instancia el 15 de octubre de 2001 y, en consecuencia, decretar la desestimación de la petición presentada ante dicho Tribunal en este caso, en todas sus partes.

JOSE A. ANDREU GARCIA
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Zenón
Pedro Zenón Encarnación
Cacimar Zenón Encarnación
Rafael Rivera Castaño
Carmelo Feliz Matta
Paul O'Leary
Miguel A. Vázquez
Antonio Corción                    CT 2001-1      Solicitud de
María A. Torres Román                             Certificación
Rosa H. García Torres
Regalado Miró Corcino
Sandra I. Reyes Echevarría

Demandantes-Recurridos

            v.

Juan R. Melecio, Presidente,
Lcdo. Carlos López, Comisionado
PPD; Pedro Figueroa, Comisionado
PNP; Damaris Mangual, Comisionada
PIP; Comisión Estatal de Elecciones;
Estado Libre Asociado de Puerto Rico

Demandados-Peticionarios

*************************************

                          SENTENCIA


San Juan, Puerto Rico, a 5 de noviembre de 2001


        Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta sentencia revocando aquella dictada por el Tribunal de Primera Instancia el 15 de octubre de 2001, y se decreta la desestimación de la petición presentada ante dicho Tribunal en todas sus partes.


        Lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez concurre en el resultado porque concluye que el Artículo 7 de la Ley Núm. 423 de 27 de octubre de 2000, según enmendada, fue desplazada por la Sección 1503(f)(1) y (2) de la Ley Federal Núm. 106-398, la cual ocupó el campo, por ser las disposiciones de la ley estatal contrarias a las disposiciones del estatuto federal. Véase Louisiana Public Service Com'n v. F.C.C., 476 U.S. 355 (1986). El Congreso Federal estableció en esa sección los requisitos para ser elector en este referéndum, de acuerdo con su autoridad constitucional para regular las elecciones y consultas federales. Véase Art. I, Sec. 4, Cl.1 de la Constitución de Estados Unidos de América; Boroughs v. United States, 290 U.S. 534 (1934); U.S. v. Classic, 313 U.S. 299 (1941); Foster v. Love, 522 U.S. 67 (1997) y Association of Community Organizations for Reform Now v. Miller, 129 F.3d 833 (6th cir., 1997). El criterio sobre elegibilidad de los electores que podrán participar en el referéndum del 6 de noviembre de 2001 está regulado por la ley federal antes citada, la cual dispone que serán elegibles para votar los electores del Municipio de Vieques registrados para votar por el Comisionado Residente en Washington para el 7 de noviembre de 2000, y aquellos que se registraron como electores luego del 7 de noviembre de 2000, pero 180 días antes de la celebración del referéndum. Véase, Foster v. Love, supra. Como consecuencia se podrían recusar los votos de todos aquellos electores viequenses que se hayan inscrito dentro del período de 180 días anteriores al referéndum, o sea, después del 6 de mayo de 2001, y que ejerzan su voto en el mismo.



                    Isabel Llompart Zeno
                Secretaria del Tribunal Supremo