*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0392p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES STUDENT ASSOCIATION
FOUNDATION, as an organization and
representative of its members, AMERICAN CIVIL
LIBERTIES UNION FUND OF
MICHIGAN, as an organization and representative of
its members, AMERICAN CIVIL
LIBERTIES UNION OF MICHIGAN, as an organization
and representative of its members,
                    *Plaintiffs-Appellees,*
MICHIGAN STATE CONFERENCE OF NAACP
BRANCHES,
                              *Plaintiff,*

> No. 08-2352

                    *v.*

TERRI LYNN LAND, Michigan Secretary of State, and
CHRISTOPHER M. THOMAS, Michigan Director of
Elections, in their official capacities,
                    *Defendants-Appellants,*
FRANCES MCMULLAN, City Clerk for Ypsilanti,
Michigan,
                              *Defendant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-14019—Stephen J. Murphy III, District Judge.

Decided and Filed: October 29, 2008

Before: MOORE and WHITE, Circuit Judges; VINSON, District Judge.[*]

_____

**OPINION**

_____

        MOORE, J., delivered the opinion of the court, in which WHITE, J., joined. VINSON, D.
J. (pp. 14-18), delivered a separate dissenting opinion.

_____

        [*] The Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by
designation.

1

KAREN NELSON MOORE, Circuit Judge. Defendants-Appellants, Michigan Secretary of State Terri Lynn Land ("the Secretary") and Director of Elections Christopher M. Thomas ("the Director") (collectively, "defendants"), bring this emergency motion to stay a preliminary injunction that the district court issued in favor of plaintiffs-appellees, the United States Student Association Foundation, the ACLU Fund of Michigan, and the ACLU of Michigan (collectively, "plaintiffs"). This preliminary injunction orders defendants to refrain from rejecting a voter's registration when that voter's identification card ("voter ID card") is returned to election officials as undeliverable and to reinstate the registration of all voters whose registrations have been rejected pursuant to this practice since January 1, 2006. We grant the defendants' motion for expedited review and we **DENY** defendants' motion for a stay, leaving in place the district court's preliminary injunction. We direct the clerk to establish an expedited briefing schedule for the defendants' appeal of the preliminary injunction ordered by the district court.

## I. BACKGROUND

This case raises the question of whether Michigan's procedures applying to voters whose ID cards are returned to the state as undeliverable violate the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg et seq. Currently, when a voter's ID card is returned as undeliverable, defendants change that individual's status from "active" to "rejected," meaning that the individual's name will not appear on local precinct lists on election day. *See* Defs.' Mot. for Stay, Ex. B, Attach. 3 at 3 (Dep't of State, Voter Registration Housekeeping Reminders); Pls.' Resp. to Mot. for Stay, Ex. 5 at 1-21 (Voter Registration Module). On October 13, 2008, the district court issued a preliminary injunction enjoining this practice and ordering defendants to reinstate the active status of all individuals removed pursuant to this policy since January 1, 2006, unless the rejection was warranted for some other lawful reason.

Section 8 of the NVRA provides requirements that states must follow in the administration of voter registration. First, state election officials must "ensure that any eligible applicant is registered to vote in an election" whenever a valid voter registration form is postmarked or received by the appropriate state official no later than 30 days before the date of the election. 42 U.S.C. § 1973gg-6(a)(1). The appropriate state election official must then "send notice to each applicant of the disposition of the application." 42 U.S.C. § 1973gg-6(a)(2). A registrant's name may not be removed from the official list of eligible voters except at the registrant's request, due to criminal conviction or mental incapacity as provided by state law, the death of the registrant, or due to a change of the registrant's residence. 42 U.S.C. § 1973gg-6(a)(3)-(4). Removal by reason of change of residence, however, may be conducted only in accordance with specific requirements set forth in subsections (b), (c), and (d) of section 8 of the NVRA. Specifically, § 8(d) provides the circumstances under which a state may remove a name from voting rolls:

1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

   (A)  confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

   (B)(i) has failed to respond to a notice described in paragraph (2); and

(ii)    has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

42 U.S.C. § 1973gg-6(d).

In Michigan, the NVRA has been implemented through the Michigan Election Law. Michigan sets four requirements that an individual must meet by the time of the next election in order to be "entitled to be registered as an elector": "The person shall be a citizen of the United States; not less than 18 years of age; a resident of the state for not less than 30 days; and a resident of the township, city, or village on or before the thirtieth day before the next regular or special election or primary election." Mich. Comp. Laws § 168.492. Since the 1998 election cycle, Michigan has employed a statewide voter registration database, the Qualified Voter File ("QVF"), which is maintained by the Secretary of State. Mich. Comp. Law § 168.509o; *see also* Defs.' Resp. in Opp. to Mot. for Prelim. Inj. at 22-23. The QVF allows local election officials throughout the state to access the voter registration database and to add, change, or delete records contained in the QVF. Mich. Comp. Laws § 168.509p. Once the proper local clerk receives and reviews an application and determines that the applicant is qualified as an elector, that clerk enters the voter's information into the QVF. *See* Pls.' Resp. to Mot. for Stay, Ex. 5 at 1-5 (Voter Registration Module). Individuals entered into this database can be identified with different status labels. "Active" is the default label which allows an individual to vote without further action or verification. *See* Defs.' Mot. for Stay at 5-6. Individual entries can also be marked as "rejected" or "cancelled," and names bearing these labels will not appear on the lists of voters distributed to polling places on election days. Pls.' Resp. to Mot. for Stay, Ex. 5 at 1-21 (Voter Registration Module); Defs.' Mot. for Stay, Ex. B. ¶ 9 (Thomas Aff.). Entries can also be marked as "verify" or "challenged," and individuals labeled as such will appear on precinct voter lists, but will be required to provide further information before casting a ballot. *See* Pls.' Resp. to Mot. for Stay, Ex. 5 at 1-21 (Voter Registration Module).

When a local clerk enters a new voter's registration information into the QVF, that voter will be marked as "active," and is therefore deemed qualified to vote. *Id.* After entering a new voter into the QVF, the local clerk will mail that individual an "original" voter ID card. Mich. Comp. Laws §§ 168.499(3), 168.500c. "[I]f the 'original' voter identification card is not returned to the clerk's office, its receipt is presumed and an applicant becomes a registered voter in the State of Michigan." Defs.' Mot. for Stay at 5-6; *see also* Mich. Comp. Laws §§ 168.499(3), 168.500c. If, however, "the original voter identification card is returned to the clerk by the post office as nondeliverable, the clerk shall reject the registration and send the individual a notice of rejection." Mich. Comp. Laws § 168.499(3); *see also* § 168.500c.[1] If no forwarding address is provided by the post office, the individual's QVF status will be changed from "active" to "reject–residence," *see* Defs.' Mot. for Stay, Ex. B, Attach. 3 at 3 (Dep't of State, Voter Registration Housekeeping Reminders), and his or her name will therefore not appear on local voting lists on election days, preventing the individual

---

[1] In addition to original voter ID cards, the clerk also may send "duplicate" or "updated" voter ID cards when an elector is "affected by a change in United States representative, state senatorial, state representative, or county commissioner district or precinct." Mich. Comp. Laws § 168.499(c). If a duplicate voter ID card is returned as undeliverable, the clerk is to "accept that as information that the elector has moved and . . . proceed in conformity with section 509aa," *id.*, which requires the clerk to send notice to the voter to confirm the voter's residence, Mich. Comp. Laws § 168.509aa(2)-(3). If this notice is returned as undeliverable, the voter status is changed to "challenge-residence," Defs.' Mot. for Stay, Ex. B, Attach. 3 at 3 (Dep't of State, Voter Registration Housekeeping Reminders), allowing the voter to cast a traditional ballot on election day upon providing further information at the polls, Mich. Comp. Laws § 168.509aa(4).

from casting a traditional ballot, though poll workers are instructed to offer a provisional ballot.[2] *See* Defs.' Mot. for Stay, Ex. B, Attach. 4 (Handling Voters Who Do Not Appear on the QVF List). Individuals may check their registration status online at the Michigan Voter Information Center. Once an individual's information is in the QVF, even if the voter ID card has not yet been printed or mailed, an individual checking his or her registration online will be directed to a screen reading, "Yes, You Are Registered!" Pls.' Resp. to Mot. for Stay, Ex. 6 (Mich. Voter Information Center).

The plaintiffs assert that Michigan's practice of changing voter status based on an undeliverable voter ID card violates the provisions of the NVRA detailing the conditions that must be met before an individual can be removed from state voting rolls.[3] This issue was brought to defendant's attention on July 8, 2008, in a letter from Mr. Bradley Heard of the Advancement Project, which asserted that Michigan's treatment of undeliverable voter ID cards violated the NVRA. Defs' Mot. for Stay at 9; *see also* Pls.' Br. in Supp. of Mot. for Prelim. Inj., Ex. 9 (Heard Ltr.). The defendants failed to respond to this letter until August 29, 2008, when they denied that the undeliverable-voter-ID policy violated the NVRA and refused to make any changes to the practice. Pls.' Br. in Supp. of Mot. for Prelim. Inj., Ex. 10 (Thomas Ltr.).

On September 17, 2008, the plaintiffs filed suit in the district court seeking an expedited hearing and injunctive relief. The plaintiffs asserted, among other things, that the undeliverable-voter-ID-card practice violates section 8(d) of the NVRA. *See* 42 U.S.C. § 1973gg-6(d). The plaintiffs contended that, because an individual becomes eligible to vote once his or her name is entered on the QVF, before an ID card is even issued, removing that individual from "active" to "rejected" status violates section 8(d), which provides the exclusive method for removal of registered voters. The plaintiffs requested that the district court enter a preliminary injunction ordering, in relevant part, that the defendants discontinue the practice of immediately rejecting a voter's registration based on the return of the original voter ID card as undeliverable, treat the return of original voter ID cards in the same manner as the return of duplicate ID cards, restore to "active" status all voters whose registrations were rejected pursuant to Mich. Comp. Laws § 168.500c after January 1, 2006 and who are not ineligible for some other reason, and maintain and preserve relevant records.

The defendants filed a brief in opposition to this motion on September 26, 2008, and the plaintiffs replied on September 29, 2008. With the permission of the district court, each of these filings exceeded the usual page limits and included extensive additional materials. On September 30, 2008, the district court held a hearing on the motion. The district court issued a preliminary

---

[2] The 2003 Voter Registration Module, which instructs local officials on using the QVF, appears to distinguish between applications that were submitted at the Secretary of State branch office ("Branch Apps.") and those that were submitted by other methods ("Non Branch Apps."). According to the module, when an original ID card from a Non Branch App. is returned as undeliverable, the voter status is to be changed to "challenged." Pls.' Resp. to Mot. for Stay, Ex. 5 at 1-29 (Voter Registration Module). This practice is not mentioned by the defendants, and more recent instructions from 2007 indicate that officials are instructed to change the voter status to "reject-residence" for all voter ID cards that are returned as undeliverable with no forwarding address, regardless of the method of registration. Defs.' Mot. for Stay, Ex. B, Attach. 3 at 3 (Dep't of State, Voter Registration Housekeeping Reminders).

[3] In the district court the plaintiffs also challenged Michigan's practice of cancelling an individual's Michigan voter registration when Michigan received information that the individual had surrendered his or her Michigan driver's license while registering for a driver's license in another state. The district court found that, while Michigan's practice likely violated the NVRA, injunctive relief was not warranted on these grounds. The plaintiffs have not cross-appealed the denial of relief based on driver's-license-based cancellation, and therefore we do not consider this issue.

injunction on October 13, 2008.[4] The district court found that the undeliverable-voter-ID-card practice violated § 8(d) of the NVRA. Specifically, the district court found that individuals become "registrants" for purposes of the NVRA as soon as they are placed on the QVF and designated "active" and thus cannot be removed unless the requirements of § 8(d) have been met. Regarding this practice, the district court found "that the plaintiffs have made a strong showing of success on the merits and a substantial but not overly strong showing of irreparable harm" and that the preliminary injunction "would work very little hardship on the defendants and would be in the public interest." Dist. Ct. Prelim. Inj. Order at 38. Specifically, the district court ordered that the defendants:

(1)   Immediately discontinue their practice of cancelling or rejecting a voter's registration based upon the return of the voter's original voter identification card as undeliverable;

(2)   Remove the "rejected" marking in the QVF from the registrations of all voters whose original voter IDs have been returned as undeliverable since January 1, 2006 until the present, unless rejection was warranted for some other lawful reason;

(3)   Make no other designation, including but not limited to "cancelled," in these voters' registration records in the QVF or elsewhere, that will prevent their ballots from being counted if they appear at the polls and give whatever further proof of Michigan residence is required or permitted under applicable state and federal law; unless such a designation is warranted by written notice from the voter or for some reason other than change of residence;

(4)   Preserve and not destroy until after December 31, 2009, any and all records relating to maintenance of Michigan's voter registration files that have, since January 1, 2006, resulted in the cancellation of the registration of voters who have applied for out of state driver's licenses, or the cancellation or rejection of voters' registrations based upon the return of original voter identification cards; and

(5)   Give no order, direction, or encouragement that any other government official or any other person engage in activity hereby prohibited to them.

*Id.* at 42.

On October 17, 2008, the defendants petitioned the district court for a stay of the preliminary injunction pending appeal, and the district court denied this motion on October 24, 2008. The defendants filed the instant motion in this court seeking a stay of the preliminary injunction pending appeal on October 24, 2008,[5] arguing that the district court abused its discretion in granting preliminary injunctive relief. First, the defendants argue that they can demonstrate a strong likelihood of success on the merits for two reasons: (1) plaintiffs did not have standing to bring their claims; and (2) Michigan's practice does not violate the NVRA because an individual whose original voter ID card is returned as undeliverable never actually becomes a "registrant," and so is never

---

[4] On October 7, plaintiffs filed an amended complaint adding as a plaintiff the Michigan State Conference of NAACP Branches. Defendant McMullen filed an answer to the amended complaint on October 22, but the other defendants have not yet filed their answer.

[5] The defendants filed their motion with us hours before the district court issued its order denying their motion for a stay.

removed from the voting rolls. The defendants next argue that the plaintiffs will not be harmed if the preliminary injunction is stayed, because the risk of voter disenfranchisement is small. Further, the defendants argue that, without a stay, they will suffer irreparable harm due to the interruption of their preparations for holding the upcoming election on November 4. Finally, the defendants argue that the public interest in enforcement of legitimate statutory processes to ensure that only qualified persons are registered to vote weighs in favor of granting a stay.

## II. ANALYSIS

In deciding whether to grant a stay of a preliminary injunction, defendants have the burden of showing: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." *Northeast Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

In considering defendants' motion for a stay of the district court's preliminary injunction, we are deciding whether the defendants are likely to be able to show that the district court abused its discretion in granting the preliminary injunction. When we review a "district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief," we review for an abuse of discretion. *Certified Restoration Dry Cleaning Network, L.L.C., v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007). We review de novo the legal conclusions made by the district court, and we review its factual findings for clear error, but our review of the district court's ultimate decision regarding injunctive relief is reviewed under the "'highly deferential'" abuse-of-discretion standard. *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). Therefore, when considering defendants' motion for a stay of the preliminary injunction, we must determine whether the defendants are likely to be able to show that the district court abused its discretion when it issued the preliminary injunction. We conclude that the defendants have not shown that it is likely that the district court abused its discretion in granting the preliminary injunction, and we must therefore deny defendants' motion to stay the preliminary injunction.

## A. Likelihood of Success on the Merits

Defendants have not shown that they are likely to succeed in showing that the plaintiffs lack standing. *See Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004). Similarly, defendants are unlikely to succeed in demonstrating that the undeliverable-voter-ID-card practice is lawful.[6] The district court's finding that the undeliverable-voter-ID-card practice violates the NVRA is a conclusion of law that we would review de novo if we were reviewing the grant of the preliminary injunction. *Certified Restoration Dry Cleaning Network*, 511 F.3d at 541. In order to establish a likelihood of success on the merits, the defendants must show that a de novo review of the district court's decision that the application of Mich. Comp. Laws § 168.500c violates the NVRA would result in a determination that Michigan's practice does *not* violate federal law. We hold that Michigan's undeliverable-voter-ID-card practice likely violates the clear language of the NVRA and that defendants have not, therefore, shown that they are likely to succeed on the merits of this issue.

---

[6] Because this is an application for a stay of the preliminary injunction, we consider only the likelihood that defendants can show that the district court abused its discretion in issuing the preliminary injunction. Thus, we consider the district court's order in light of the arguments of the parties before us in their briefs addressing the defendants' motion for a stay. Because the district court based its issuance of the preliminary injunction on § 1973gg-6(d) alone and did not consider 42 U.S.C. § 1973gg-6(a), nor have the parties raised the issue, we do not consider at this time what, if any, implications § 1973gg-6(a) has in regard to the definition of "registrant." We only note that the definition of "registrant" may in fact be broader than we have contemplated in this opinion and reserve consideration of this issue.

In 1993, Congress passed the NVRA as a measure meant to "reinforce the right of qualified citizens to vote." *Ass'n of Cmty. Orgs. for Reform Now v. Miller (Miller II)*, 129 F.3d 833, 835 (6th Cir. 1997). The section of the NVRA at issue limits the methods which a state may use to remove individuals from its voting rolls and is meant to ensure that eligible voters are not disenfranchised by improper removal. *See Bell v. Marinko*, 367 F.3d 588, 591-92 (6th Cir. 2004). The provision at issue states:

Removal of names from voting rolls

(1)   A State shall not remove the name of a *registrant* from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

    (A)   confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

    (B)(i) has failed to respond to a notice described in paragraph (2); and

    (ii)   has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

42 U.S.C. § 1973gg-6(d) (emphasis added).

A simple reading of this statute reveals exactly whom this statue protects and from what: States may not remove "registrants" from an official list of eligible voters based on a change in residence unless certain conditions have been met. We believe that, if a person is a "registrant," a state may not remove his or her name from an official registration list on the grounds that his or her residence has changed unless the specified criteria of 42 U.S.C. § 1973gg(d) are met. We conclude that it is highly unlikely that the defendants will be able to show that the district court's interpretation of the NVRA was erroneous.

Given the clarity of the statute, it is not surprising that defendants do not dispute the fact that, if persons rejected under the undeliverable-voter-ID-card practice are registrants, such removals violate the NVRA. Rather, as was the case in the district court, "[t]he parties' dispute over the legality of the undeliverable ID practice essentially boils down to a disagreement over the meaning of the word 'registrant,' as it appears in the NVRA." Dist. Ct. Prelim. Inj. Order at 16. Defendants contend that, because the NVRA does not define "registrant," state law must provide the definition. Defendants also assert that, under Michigan law, an individual is registered to vote only after he or she has received an original voter ID card. Defendants argue that an individual whose original voter ID card was returned as undeliverable was never a registrant in Michigan such that the protections of the NVRA apply. Accordingly, defendants assert that they can reclassify these individuals as "rejected" voters within the QVF even if the conditions required by the NVRA have not been met. For the following reasons, we are not persuaded that defendants' arguments are likely to succeed.

First, we do not agree that state law must be used to define "registrant." In fact, Michigan law recognizes that federal law determines who is a registrant: "Notwithstanding another provision of law to the contrary, a person who is a qualified elector in this state and who registers to vote in a manner consistent with the national voter registration act of 1993 is considered a registered voter under this act." Mich. Comp. Laws § 168.509t(1). The district court correctly observed that "making the question of who is a 'registrant' a matter of state law would frustrate the NVRA's purpose of regulating state conduct of elections, by essentially permitting states to decide when they

will be bound by the [NVRA's] requirements." Dist. Ct. Prelim. Inj. Order at 18.[7]   While the NVRA allows states to have their own eligibility requirements and registration procedures and policies, it places limits on those policies. One such limit is the NVRA's mandate that "registrants" can be removed from voter rolls only if certain conditions are met. If states could define "registrant," they could circumvent the limitations of the NVRA by simply restricting the definition, and hence the federal protections of the NVRA, to a very limited class of potential voters. A federal statute cannot adequately protect the rights of individuals from actions of the state if the state is free to define the protected class as broadly or as narrowly as it chooses. If we were to adopt defendants' view, states could completely ignore the requirements of the NVRA, 42 U.S.C. § 1973gg-6(d). We refuse to import such a reading to this statute.[8]

Because state law cannot control the definition of "registrant," we resolve the meaning of "registrant" under the NVRA as a matter of federal law. We have found no case which has considered this issue. Because the ultimate goal of registering to vote is to permit a person actually to vote, we think that, at the very least, a person becomes a "registrant," for the purposes of the NVRA, from the first moment that he or she is actually able to go to the polls and cast a regular ballot.

Though the definition of "registrant" is governed by federal law, because that definition involves determining when an individual is actually able to cast a vote, we must look to state law defining when an individual can first go to the polls and cast a regular vote, regardless of what label state law may attach to that individual.[9]   According to defendants, once a clerk determines that an application passes initial review, that applicant's name is entered into the QVF as an "active" voter. Pls.' Resp. to Mot. for Stay, Ex. 5 at 1-21 (Voter Registration Module). If the original voter ID card is not returned to the clerk as undeliverable, that individual is considered a registered voter without any further action by the clerk. Defs.' Mot. for Stay at 5-6; *see also* Mich. Comp. Laws §§ 168.499(3), 168.500c. If, however, the original voter ID card is returned to the clerk as undeliverable, the clerk must go back into the QVF and change that individual's voter status from "active" to "rejected." Defs.' Mot. for Stay, Ex. B, Attach. 3 at 3 (Dep't of State, Voter Registration Housekeeping Reminders). Defendants assert that because state law dictates that such voters "shall

---

[7] Supreme Court precedent indicates that when federal statutes give states limited powers within a federal statutory framework, the words creating that limitation are defined by federal, rather than state law. For example, the Federal Tort Claims Act ("FTCA") makes the United States amenable to suit and liable for damages in certain circumstances but provides that the government will not be liable for punitive damages. 28 U.S.C. § 2674; *see also Molzov v.United States*, 502 U.S. 301, 304-05 (1992). In *Molzov*, the Supreme Court held that "the extent of the United States' liability under the FTCA is generally determined by reference to state law." *Id.* However, the Court also held that the definition of "punitive damages," a phrase used in "a federal statute, is by definition a federal question." *Id.*

[8] The dissent quotes a single sentence from the district court's opinion in *Ass'n of Cmty. Orgs. for Reform Now v. Miller* (*Miller I*), 912 F. Supp. 976 (W.D. Mich. 1995), which seems to assume that state law determines when someone is registered. Dissent at 14. This issue of what law determines the meaning of "registrant" was not examined extensively in that district court opinion, and it was not considered by this court when we reviewed the district court's ruling. *Miller II*, 129 F.3d 833. The dissent's assertion that an unchallenged district court statement is somehow binding on us or is the definitive "law with respect to th[is] aspect of Michigan's voter registration procedure" is legally incorrect. Dissent at 14, n.1. Even assuming that the district court in *Miller I* found that state law defines registrant for the purposes of the NVRA, prior district court cases do not bind this court, and the district court in *Miller I* does not convince us that defendants here are likely to succeed in this argument.

[9] The dissent cites the district court's determination in *Miller I* that "under the NVRA the states are still left the task of determining that an applicant is eligible, and that the registration form as submitted complies with state law." *Miller I*, 912 F. Supp. at 987; Dissent at 14. Nothing we conclude today contradicts this statement. We are not focusing on Michigan's eligibility requirements or on the process it uses to determine who should be entered into the QVF. We are considering only what Michigan does once it has granted an individual a voting status that "presumes" eligibility. Defs.' Mot. for Stay at 5-6.

be deemed not registered," Mich. Comp. Laws § 168.500c, the fact that the status of these voters was changed from "active" to "rejected" does not constitute removal of a "registrant" under the NVRA. We conclude that defendants' argument is not likely to succeed on the merits.

Defendants' entire argument is based on their assertion that the state-law definition of "registrant" must apply to the NVRA. However, as we explained above, this cannot be the case. While state law is vital in determining when a person becomes actually eligible to vote, the labels that state law places on individuals are not binding for purposes of the NVRA. Said another way, it does not matter whom Michigan decides to call a "registrant"; what matters is, functionally speaking, when an individual becomes able to cast a ballot.

In Michigan, an individual must meet four specific requirements in order to be eligible to vote: "The person shall be a citizen of the United States; not less than 18 years of age; a resident of the state for not less than 30 days; and a resident of the township, city, or village on or before the thirtieth day before the next regular or special election or primary election." Mich. Comp. Laws § 168.492. Receipt of the original voter ID card is not a requirement for eligibility. Instead, the original voter ID card that is sent out by the state of Michigan is the notice of disposition of the application to register to vote required by 42 U.S.C. § 1973gg-6(a)(2). If this were not the case, it appears that Michigan would be in violation of that section of the NVRA. Michigan does not contest that the original voter ID card serves this purpose or assert that some other document serves as the required notice. Because a notice of disposition alerts an individual that the state has determined that he or she meets state eligibility requirements, it necessarily follows that the eligibility decision has already been made. Indeed, the voter who checks his or her status after his or her name has been entered on the QVF will find the message "Yes, You Are Registered!" even before the voter ID card is mailed to him or her. Pls.' Resp. to Mot. for Stay, Ex. 6 (Mich. Voter Information Center). Therefore, receipt of the original voter ID card cannot be part of the eligibility decision.

Applying this lens of analysis, a simple example illustrates why this status change on the QVF from "active" to "rejected" is meaningful and why individuals in Michigan are protected "registrants" under the NVRA from the moment the clerk identifies them as "active" in the QVF. Suppose that the clerk received a voter application from Mr. Doe, and per state law, entered him into the QVF as "active," and then sent him an original voter ID card. Suppose also that Mr. Doe never received this original voter ID card, but due to human error, loss, or delay, the clerk did not receive the original voter ID card marked as undeliverable until *after* the election. On Election Day, Mr. Doe would appear as "active" in the QVF, and thus his name would appear on the poll list and he would be permitted to cast a regular ballot. Defendants assert that such a scenario is unlikely, but they cannot deny the fact that once Mr. Doe has been entered into the QVF as "active," he will be treated as a regular voter. Because Michigan has chosen to treat individuals as "active," as individuals permitted to cast ballots upon entry of their applications into the QVF, defendants cannot then withdraw this "active" voter status without complying with the NVRA. Once the state takes the step of identifying individuals as active voters, those individuals clearly become "registrants" protected by the NVRA.

Throughout their motion for a stay, the defendants highlight the fact that a prior district court case determined that the undeliverable-voter-ID-card practice did not violate the NVRA. *See Ass'n of Cmty. Orgs. for Reform Now v. Miller* (*Miller I*), 912 F. Supp. 976, 986-87 (W.D. Mich. 1995). The dissent similarly relies on *Miller I*, stating that it "involv[ed] the same Michigan practice, the same Michigan statute, and the same provision of the [NVRA]." Dissent at 14. This reliance is misplaced. The district court decided *Miller I* two years before Michigan implemented the QVF, and the district court opinion in *Miller I* contains no mention of this system or how it would work. Additionally, the *Miller I* court did not have full information regarding the intricacies of the system or how Michigan would implement it.

Instead, the district court in *Miller I* rejected a claim that "under the NVRA an applicant is registered upon merely filling out a registration application." *Id.* at 986. Contrary to the dissent's characterization, *Miller I* did not "reject[] the view that an applicant is automatically registered to vote for purposes of the NVRA merely upon filling out the registration application *and being placed on the official roll*." Dissent at 14 (emphasis added). *Miller I* did not address the consequences of being placed on any official list such as the QVF, and was instead limited to considering the consequences of "filling out a registration application." *Miller I*, 912 F. Supp. at 986. In the instant case, plaintiffs do not argue, and we do not hold, that filling out an application is the event that triggers NVRA protection. Instead, we conclude that it is likely that once Michigan gives an individual "active" status in the QVF, the status that would permit the individual to cast a regular ballot on Election Day, the individual becomes a "registrant" protected by the NVRA. The district court in *Miller I* did not address such an argument, and thus *Miller I* is not relevant to this determination.

Further, the *Miller I* court found that "under the NVRA the states are still left the task of determining that an applicant is eligible, and that the registration form as submitted complies with state law." *Id.* at 987. Nothing in our holding today contradicts that finding. To the contrary, Michigan is still free to set eligibility standards and to evaluate whether each applicant meets those standards. However, once Michigan chooses to categorize an individual in such a way that would allow him or her to go to the polls and cast a regular ballot, regardless of what Michigan calls that person, he or she is a "registrant" for purposes of the NVRA. Currently, once the state determines that an applicant is qualified as an elector and affords an individual "active" status in the QVF, that individual is entitled to cast a ballot and thus is a "registrant" under the NVRA. Accordingly, our conclusion today does not contradict the district court opinion in *Miller I*, but rather modifies it in light of Michigan's decision to list approved applicants as "active" in the QVF once the clerk has reviewed their applications.

We disagree with the dissent's claim that Sixth Circuit precedent conflicts with the district court's interpretation of the NVRA here. First, the Sixth Circuit opinion in *Miller II* addressed only the constitutional challenges to the NVRA made by Michigan in its appeal. *Miller II*, 129 F.3d at 834 ("We agree with the district court that the [NVRA] is constitutional, and that all of the involved plaintiffs are entitled to bring suit."). Because no issues concerning the *Miller I* district court's interpretation of specific NVRA or Michigan state law provisions were raised on appeal, we had no occasion to address that district judge's interpretation of the provisions at issue in this stay motion before us now. Thus, the Sixth Circuit's opinion in *Miller II* is irrelevant to today's case.

Second, our opinion in *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), is similarly distinct.[10] In *Marinko*, we considered an Ohio law that allowed "registered voters to challenge the right of any person to vote." *Id.* at 589. Ohio law instructed the Board of Elections to conduct a hearing to investigate the residency of each challenged individual, and, if the Board concluded that the challenged individual was not a resident of the precinct and therefore ineligible to vote, the Board should remove that person from the rolls. *Id.* at 591-92. The Ohio law considered in *Marinko* is very different from the one at issue here. Plaintiffs here challenge the rejection of *eligible* voters. The individuals who would be harmed by Michigan's undeliverable-voter-ID-card practice are eligible voters. These eligible voters are entitled to the protections of the NVRA. *Id.* at 592 ("The National Voter Registration Act protects only 'eligible' voters from unauthorized removal."). By contrast, the Ohio law at issue in *Marinko* permitted the state, *after a hearing on the issue*, to remove the names of *ineligible* individuals from its rolls. *Id.* The rejection of an *eligible* voter based solely on the undeliverable-voter-ID-card practice is not at all similar to a state's hearing-based

---

[10] We note that the bulk of the dissent's discussion of *Marinko* relates to the district court's opinion. What is relevant here is the Sixth Circuit's opinion in that case.

determination that a particular challenged individual is not an eligible voter and should therefore be removed from the voting rolls. Here there has never been a determination that the voters are ineligible. To the contrary, the only determination made as to the voters here is that they are eligible, a determination the clerk receiving the application makes before forwarding the applicant an original voter ID card. Mich. Comp. Laws § 168.500c.

We determined in *Marinko* that the particularized challenge hearing for each specific voter established that the voter was not in fact a resident of the precinct and therefore that the voter was not eligible to vote in the precinct and could be removed from the voting rolls. We wrote, "Because the [NVRA] does not bar the Board's continuing consideration of a voter's residence, and instead encourages the Board to maintain accurate and reliable voting rolls, we find that the Board's procedures in this case do not contravene the [NVRA]." *Id. Marinko* thus endorses the challenge-hearing approach utilized by Ohio to investigate a particular voter's proper residence for voting purposes. *Marinko* does not endorse the Michigan practice of withdrawing all voters' "active" status if their original voter ID cards are returned to the clerk as undeliverable.

Under our analysis, an individual is a "registrant" under the NVRA at the time that he or she is listed as "active" in the QVF, and any such individual who is "rejected" under the Michigan system because his or her original voter ID card is later returned as undeliverable has had his or her rights, as defined by the NVRA, 42 U.S.C. § 1973gg-6(d), violated. We therefore conclude that the defendants have not met their burden of making a sufficient demonstration that, ultimately, the Michigan undeliverable-voter-ID-card practice does not violate the NVRA. Accordingly, we hold that the defendants have not shown that they are likely to succeed on the merits, and that this factor weighs heavily against granting the stay that the defendants seek.

## B. Harm to Defendants

The defendants assert that it is both "possible" and "feasible" for them to comply with the preliminary injunction. Defs.' Mot. for Stay at 38. They raise two potential harms they will face if the requested stay is not granted: (1) changing procedures to comply with the preliminary injunction will cause a resource drain for state and local officials; and (2) the reactivation required by the preliminary injunction will revive old records, so that if previously rejected individuals later re-registered to vote at a new address, their previous address will spring back up in the system, creating new inaccuracies. *Id.* at 38-39. The defendants dispense with the second potential harm themselves, stating that a software program will have to be written to prevent potential errors. *Id.* at 39. The defendants do not, however, forecast great confusion associated with the implementation of this new software. Nor do they predict, after implementing this program, that any changes produced in compliance with the district court's preliminary injunction will result in erroneous disenfranchisement. Accordingly, the only harm left is the potential resource drain for state and local officials, of which writing the new computer program for the QVF is one aspect.[11]

We are cognizant of Supreme Court decisions counseling courts to exercise "proper judicial restraint" before making "precipitate changes" to election procedures and policies when "an impending election is imminent and a State's election machinery is already in progress." *Reynolds v. Sims*, 377 U.S. 533, 585-86 (1964); *see also Purcell v. Gonzalez*, 549 U.S. 1, 7-8 (2006). We have taken this potential practical problem into careful consideration, and we do not make light of the burden that the district court's ruling may impose on Michigan's Secretary of State. *Purcell*,

---

[11] The defendants' reply brief suggests that the administrative burden is greater than they once thought. However, we are considering whether to stay the district court's decision to grant a preliminary injunction, a decision that we review itself only for abuse of discretion, and this new argument was never presented to the district court. Accordingly, we cannot say that the district court abused its discretion by believing defendants' earlier indications that the burden was minimal.

however, demands "careful consideration" of any legal challenge that involves "the possibility that qualified voters might be turned away from the polls." *Purcell*, 549 U.S. at 7. In this case, the district court's preliminary injunction ensures that qualified voters whose registrations were rejected due to the undeliverable-voter-ID-card practice will not be turned away at the polls. Moreover, the district court has determined that staying the preliminary injunction would likely put individual voters at risk of disenfranchisement. Additionally, the preliminary injunction affects a small fraction of Michigan voters, at most 5500 individuals, and the change is therefore not a "precipitate" alteration to the state's entire voting methodology. *See* Defs.' Mot. for Stay at 39.

Moreover, defendants have already ceased using the undeliverable-voter-ID-card practice, *see* Pls.' Resp. to Mot. for Stay, Ex. 7 (Mich. Dep't of State, Federal Court Ruling), and appear already to have identified the voters whose voter status must be changed based on the preliminary injunction, *see* Defs.' Mot. for Stay at 39 (noting how many individuals must be reactivated). Given the fact that defendants have quickly succeeded in complying with these components of the preliminary injunction, we cannot see how implementing the final step of the preliminary injunction, changing these voters' designation on the QVF as ordered by the district court, will cause irreparable harm. To the contrary, we conclude that defendants have shown no real harm to themselves or to voters especially in light of the fact that the preliminary injunction permits defendants to label these voters "verify" and require further verification of their eligibility at the polls.

Because the only harm that the defendants assert is an administrative burden that they admit to be manageable, we conclude that this factor weighs against granting the requested stay.

## C. Substantial Harm to Others and Public Interest

As discussed above, the preliminary injunction is necessary to protect the individual voters of Michigan affected by the undeliverable-voter-ID-card practice. The defendants raise a variety of potential harms to others and to the public that they suggest will result if their requested stay of the district court's preliminary injunction is not granted. First, the defendants assert that court orders affecting elections may "result in voter confusion and cause a chilling effect." Defs.' Mot. for Stay at 41. The defendants do not assert that compliance with the preliminary injunction will result in the wrongful removal of any voters. Instead, the district court's preliminary injunction ensures that each individual who has properly registered to vote but was removed due to an error that is out of his or her control will be able to cast a ballot on election day. Granting the stay of the preliminary injunction would cause confusion, leaving recently registered voters who have not received their original voter ID cards unsure of their status and of what they need to do in order to exercise their right to vote.

Defendants also contend that, even if an individual is wrongly purged from the poll books due to the undeliverable-voter-ID-card practice, he or she will still be able to cast a provisional ballot, and thus no disenfranchisement occurs. However, this argument ignores Michigan law, which allows for some provisional ballots to go uncounted. In fact, in the 2006 elections, only 19.1% of all provisional ballots cast in Michigan were counted. *See* United States Election Assistance Commission, 2006 Election Administration and Voting Survey, at 19 (Dec. 2007). Given that not all provisional ballots will necessarily be counted, the availability of provisional ballots may not protect those wrongly purged due to the undeliverable-voter-ID-card practice from substantial harm.

The defendants next assert that because the preliminary injunction will likely restore to the rolls some individuals who are *not qualified* to vote, there is a risk of both voter-registration fraud and actual voter fraud. Though the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which risks invalidation of properly registered voters. *Cf. Marinko*, 367 F.3d at

590-92. The NVRA strikes a balance between removing fraudulent registrations while ensuring that legitimate voters are able to vote, and Michigan cannot remove names from its rolls in a manner that fails to respect this balance that Congress has drawn. Currently, Michigan's undeliverable-voter-ID-card practice carries a risk of disenfranchising a large group of qualified voters.

Erroneous registrations harm the election itself only when improper registrants actually vote. Importantly, the preliminary injunction allows the state to guard against voter fraud by allowing the state to recategorize individuals affected by the undeliverable-voter-ID-card practice to "verify" status. *See* Dist. Ct. Stay Order at 2-3. This option, which the state appears to be exercising, allows the state to require individuals reinstated by the preliminary injunction to verify their residence at the polls before casting a regular ballot. *See* Pls.' Resp. to Mot. for Stay, Ex. 7 (Mich. Dep't of State, Federal Court Ruling). This is the practice that the state uses to avoid voter fraud by verifying the eligibility of voters whose eligibility may be questionable. Defendants do not argue that this system is insufficient to successfully weed out fraudulent voters. Because the risk of actual voter fraud is miniscule when compared with the concrete risk that Michigan's policies will disenfranchise eligible voters, we must conclude that the public interest weighs in favor of denying the stay of the preliminary injunction. The preliminary injunction eliminates a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process. Accordingly, the district court's preliminary injunction seeks to ensure that Michigan's elections are *more* fair, and to reach any other result would fly in the face of the very purpose of the NVRA.

## D. Conclusion

We hold that each of the four factors discussed above weighs against granting the stay of the district court's preliminary injunction that the defendants seek. In reaching this conclusion, we note that the district court accepted voluminous submissions from the parties and conducted a hearing, and we have the benefit of considering that information. The district court carefully considered all of the materials presented at that hearing, and we cannot say now that the district court abused its discretion in issuing the preliminary injunction.

## III. CONCLUSION

In seeking a stay, the defendants carry the heavy burden of demonstrating that the district court likely abused its discretion in issuing the preliminary injunction. In order to meet this burden, defendants must convince this court that a stay is necessary in light of: (1) defendants' likelihood of success on the merits; (2) any irreparable harm defendants will suffer if the stay is not granted; (3) any substantial harm to the plaintiffs that will result from a grant of the stay; and (4) what is in the best interest of the public. Though, at this late date, we understand the prudence of a policy of limited federal court involvement in elections, this fact does not change defendants' burden. Considering that the defendants have indicated that the burden that the district court's preliminary injunction imposes on them is not large; the defendants are highly unlikely to succeed on the merits; and without the preliminary injunction, plaintiffs' members, along with members of the public as a whole, face wrongful disenfranchisement, we must **DENY** the requested stay of the district court's preliminary injunction.

---------------

**DISSENT**

---------------

VINSON, District Judge, dissenting.  I respectfully dissent. I believe it is important to emphasize preliminarily that the issue raised in this case --- involving the same Michigan practice, the same Michigan statute, and the same provision of the National Voter Registration Act ("NVRA") --- was litigated and decided against the plaintiffs almost thirteen years ago. Specifically, the plaintiffs argued in *Association of Community Organizations for Reform Now ("ACORN") v. Miller,* 912 F. Supp. 976 (W.D. Mich. 1995), as plaintiffs do here, that Michigan's voter identification card statute [Mich. Comp. Laws § 168.500c] violated the NVRA because it authorized removal of registered voters from the official voter rolls in a manner other than those specified in 42 U.S.C. § 1973gg-6(d). In a well-reasoned opinion, the district court in *Miller* rejected the view that an applicant is automatically registered to vote for purposes of the NVRA merely upon filling out the registration application and being placed on the official roll. *Id.* at 986-87. Rather, the court explained that section 168.500c "clearly provides that an applicant is not registered until he or she receives a voter identification card." *Id.* at 986. Because an applicant is not registered to vote under state law unless and until he or she receives the card, there was no conflict between the two statutes because "under the NVRA the states are still left the task of determining that an applicant is eligible, and that the registration form as submitted complies with state law." *Id.* at 987. The decision in *Miller* was later affirmed by this Court, albeit without discussion of that particular holding. *See ACORN v. Miller,* 129 F.3d 833 (6th Cir. 1997).[1] Therefore, I cannot agree with the majority that the plaintiffs have a substantial likelihood of success on the merits.

The district judge in this case acknowledged the existence of *Miller*, but he disagreed with the earlier decision because, ultimately, he found that: "What the state may *not* do and still act consistently with the NVRA is to place a potential voter's name on the [Qualified Voter File] in a status that permits the registrant to vote, only to later mark the registration as 'rejected' at a later date." *See* District Court Order at 19-20. In other words, the district court concluded that a person is to be regarded as a "registrant," and is thus protected under the NVRA, "at the moment his or her name appears on 'the official list of eligible voters,'" *id.* at 18, and may only be removed pursuant to the specific provisions in the NVRA. *Id.* at 19. The majority shares this view. I believe this conclusion is not only inconsistent with the law as it has been applied in Michigan ever since the district court opinion in *Miller*, but, more importantly, it is inconsistent with Sixth Circuit precedent.

That precedent arose in *Bell v. Marinko,* 235 F. Supp. 2d 772 (N.D. Ohio 2002), which involved several individual plaintiffs who were included in Ohio's "official list" of registered voters. Following an evidentiary hearing, the plaintiffs were found to be *seasonal* residents of the precincts in which they were registered to vote, and they had their registrations terminated based on, and pursuant to, an Ohio state law that defined a "qualified elector" as a person who resided in the

---

[1] The holding was not discussed by this Court because, apparently, the issue was not raised on appeal. This is not at all surprising since it was State of Michigan defendants who appealed and, obviously, they had no reason to challenge a ruling in their favor. However, the plaintiffs did not challenge it by cross appeal. The holding has, therefore, remained the law of that case and the law with respect to that aspect of Michigan's voter registration procedure for almost thirteen years, and the defendants "have been enforcing and implementing the process under the auspices of that opinion ever since." To be clear, despite the majority's suggestion to the contrary, I am not proposing that the district court opinion in *Miller* is "somehow binding" on this Court. However, the opinion is relevant to the extent it demonstrates that a reasonable jurist can, and has, reached a different conclusion from the majority. More importantly, it speaks to the wisdom of entering an injunction on an emergency basis on the eve of an important election when the procedures being enjoined have been used for more than a decade *specifically on the basis of that opinion.*

relevant precinct on a *permanent* basis.[2] They filed suit, alleging that the only way to be taken off an "official" voter list is in accordance with the specific conditions set forth in the NVRA: (i) at their own request, (ii) by reason of conviction of a crime or mental disability, or (iii) change of residence. *Id.* at 775. The district court disagreed. It began by noting that the NVRA was adopted "'to establish procedures that will increase the number of eligible citizens who register to vote in elections for federal office,' while also assuring that '*accurate and current* voter registration rolls are maintained.'" *Id.* (quoting 42 U.S.C. § 1973gg(b)(1), (4) (emphasis added)). Although the NVRA sought to accomplish these dual objectives by, *inter alia*, ensuring that "*once registered*, voters could not be removed from registration rolls because of a failure to vote or changed addresses," the district court noted that it was *state law* that determined as a threshold matter whether and when an individual is a qualified voter in the first instance. *See id.* at 776-76 (emphasis added). The Ohio statute in *Bell* required, among other things, that all voters "'continue[] to reside in the precinct until the next election.'" *Id.* at 776 (quoting *In re Protest Filed by Citizens for Merit Selection of Judges, Inc.,* 49 Ohio St. 3d 102, 103-04 (1990)). The plaintiffs argued that the "absolute language" in the NVRA required a finding that the defendants violated federal law because the conditions described in section 1973gg-6(a)(3), noted *supra*, were not present, but the district court held:

> [T]hat reading overlooks the precondition to being entitled to vote: "continu[ing] to reside in the precinct until the next election." If the residency precondition is not met, a person is not entitled to vote: he is not a "qualified elector." *See [In re Protest, supra,* 49 Ohio St. 3d at 104]* (a person "is not an 'elector' or 'qualified elector' unless his actual current residence is registered with the board of elections.").

> Residency within the precinct is a crucial qualification. \*\*\* One simply cannot be a "qualified elector" entitled to vote unless one resides in the precinct where he or she seeks to cast his ballot. And, "if one never lived within a precinct, one cannot continue to reside in the precinct." He or she is not, and cannot be an "eligible voter," *even if listed on the Board's rolls as such.*

> The VRA does not affect Ohio's ability to condition eligibility to vote on residence. Nor did it undertake to regulate challenges, such as that presented here, to a registered voter's residency ab initio. *If the action of the Board were to be found to violate § 1973gg-6(a)(3), the effect would be to grant, and then protect, the franchise of persons not entitled to vote.*

> \*\*\*

> I conclude that the VRA cannot be read in this manner. To do so would set the stage for chaos whenever a challenge to one of the most fundamental preconditions to voting --- residency within the precinct --- arose. The VRA and its manifest purposes, to make enrollment easy and protect the rolls from expungement on the basis of bias or other improper motive, while allowing disqualification when justified, would be frustrated.

*Id.* at 776 (emphasis added). The district court determined that Ohio's voter residency challenge and disqualification process must be read *in pari materia* with the NVRA*, id.*, and it summed up its holding on this point as follows: "Plaintiffs registered to vote. They exercised that franchise,

---

[2] I recognize that the present case involves a statute in Michigan (not Ohio), and, also, that the alleged violation in *Bell* arose under a different subsection of section 1973gg-6 of the NVRA. Nevertheless, as will be discussed, I believe the case is closely analogous and highly instructive. Indeed, the underlying holding of *Bell* --- that state law determines whether a person is an eligible voter and the state may challenge eligibility without violating the NVRA "even if [the voter is] listed on the Board's rolls as such" --- would appear to control this case.

presumably, until challenged. The ability of the challengers to assert that plaintiffs were not eligible, *and had not ever been eligible*, and of the Board to consider and resolve that challenge, does not contravene § 1973gg-6(a)(3)." *Id.* at 776-77 (emphasis added).

On appeal, the plaintiffs in *Bell* argued, just as the plaintiffs do here, that the NVRA "sets forth the exclusive reasons for which a state may remove a voter from a voting precinct's list of registered voters," and, because the defendants below had removed the plaintiffs from the official list even though they did not meet that criteria, the removal "violated the Act." *Bell v. Marinko,* 367 F.3d 588, 591 (2004). The Sixth Circuit ruled against the plaintiffs and held as follows:

> Section 1973gg-6(a)(3) of the Act provides that the name of a registrant "may not be removed from the official list of eligible voters except" when the registrant requests such removal, when the registrant has been convicted of a crime, or when he or she is mentally incapacitated. Also, section 1973gg-6(a)(4) allows for removal pursuant to a state program or activity "that makes a reasonable effort" to remove ineligible voters by reason of death or change of residence. Appellants argue that because none of these has occurred, their names may not be removed. We disagree.

> *In creating a list of justifications for removal, Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place.* The National Voter Registration Act protects only "eligible" voters from unauthorized removal. *See* 42 U.S.C. § 1973gg-6(a)(1) (seeking to "ensure that any *eligible* applicant is registered to vote in an election"); *Id.* at § 1973gg-6(a)(3) (providing that "the name of a registrant may not be removed from the official list of *eligible* voters except" under specific circumstances) (emphases added). Eligible voters, at a minimum, are those who qualify as bona fide residents of the precinct in which they are registered or wish to register to vote. *See, e.g.,* [collecting cases]. Residence, as defined in section 3503.02(a) of the Ohio Revised Code, is that place "in which the person's habitation is fixed and to which, whenever the person is absent, the person has the intention of returning."

*Id.* at 591-92 (emphasis added). The Court went on to explain that the purpose of the NVRA was to ensure that "'*accurate and current* voter registration rolls are maintained,'" *see id.* at 592 (quoting 42 U.S.C. § 1973gg-6(a)(4) (emphasis added)), therefore, the statute could not be read to preclude removal of the name from an official roll when the would-be voter was ineligible and improperly registered to vote in the first instance. *Id.* at 591-92.

As stated previously, under the Michigan law at issue, an individual is not registered until he or she receives a voter identification card. *See* Mich. Comp. Laws § 168.500c. Consequently, anyone placed on the official roll prior to receiving his or her card is ineligible and not registered to vote. The Sixth Circuit has expressly rejected the position that the district court apparently adopted here: that a voter placed on an official voter list --- even if he or she was "*ineligible and improperly registered to vote in the first place*," *see Bell, supra,* 367 F.3d at 591-92 --- may be removed from an official voter list only in the specific ways set out in the NVRA. To hold for the plaintiffs in this case would produce an upside down result, for, as this Court recognized in *Bell*, it would "effectively grant, and then protect, the franchise of persons not eligible to vote." *Id.* at 592.

In his decision, the district judge here believed it significant (indeed, the case "hinge[d]" on the fact) that a voter in the QVF could vote immediately, even if his or her identification card "were to be returned as undeliverable only *after* an election has intervened." District Court Order at 18-19 (emphasis in original). In other words, because a voter in the QVF may be permitted to vote pending attempted delivery of the identification card, the district court determined that the voter is

automatically protected as a "registrant" under the NVRA. The majority also believes this fact to be significant. Indeed, the majority states that "what matters is, functionally speaking, when an individual becomes able to cast a ballot." Majority Op. at 9; *accord id.* at 17-19 (concluding that "once Michigan gives an individual 'active' status in the QVF, the status that would permit the individual to cast a regular ballot on Election Day, the individual becomes a 'registrant' protected under the NVRA."). Using a "simple example" involving voter Mr. Doe, the majority states that if Mr. Doe is listed as "active" in the QVF, then he would be permitted to cast a regular ballot even though his identification card may later be returned as undeliverable. *Id.* at 17-18. The majority thus concludes that "[o]nce the state takes the step of identifying individuals as eligible voters, those individuals clearly become 'registrants' protected by the NVRA." *Id.* at 18. In my view, this conclusion flatly contradicts the holding in *Bell, supra,* where, as noted, the plaintiffs registered to vote *and actually "exercised that franchise . . . until challenged."* Because the voters in *Bell* were not only presumptively "eligible" to cast a ballot, *but they actually did*, they were unquestionably "registrants" under the NVRA as the majority construes that term. Yet, the district court and Sixth Circuit held that it was of no moment that the voters had been placed on the rolls and previously allowed to vote because the voters had never been eligible to vote under state law at the outset. Thus, insofar as the voters in the present case are also ineligible to vote and improperly registered under state law, it is not significant for NVRA purposes that they were placed in the QVF.

The majority suggests that I miscomprehend the definition and meaning of the term "registrant." Regardless of whether a voter is on the QVF, a different type of computer database, in a paper file, or on a rolodex, the question of who is a "registrant" ultimately turns on who is a qualified voter *legitimately* on the voting rolls of the state. The majority appears to take the position that everyone in the QVF is per se qualified, but there is no justification in the record for that conclusion. In fact, the opposite seems more probable. There is a presumption that if your mail is not delivered then you do not reside at the listed address. That presumption is used in the law and in business every single day.

Furthermore, I do not agree with the majority that the defendants have failed to show irreparable harm. The Michigan law and practice has been long established and has, apparently, not presented any real problems. Now, only days before this very important election, a federal court has decided that the Michigan state voter registration process must be immediately enjoined. While the defendants have conceded that "it is possible" to comply with the injunction, to do so will require significant reallocation of state and local resources in preparation for the upcoming election, as well as inject a serious risk of unintended error that would only be discovered after the election. As the defendants have persuasively argued, they have been enforcing the relevant statutes and implementing the accompanying procedures for more than a decade based on existing law, and it is a significant burden for them to implement a new procedure with less than one week until the election. The district court's opinion seriously alters the status quo on the eve of an election, and it is completely unnecessary given that, as set forth above and based on existing precedent, the practice being challenged does not appear to even conflict with or violate the NVRA.

Nor do I believe that there is any evidence that the plaintiffs will be substantially harmed by issuing the stay and denying the injunction. As the defendants demonstrated in the district court [*see* Defendants' Exhibit C to Motion for Stay], and as they contend in this appeal, the provisional ballot process ensures that even those individuals who have their original voter identification card returned will not be automatically disqualified from voting November 4th. Rather, the voter with proper identification will be permitted to essentially "re-register" on election day.

And lastly, I believe the defendants have adequately shown that the stay is in the public interest. Despite what the majority contends, voter fraud is real and should not be condoned. There is obviously a strong public interest in the integrity of the voting process and maintaining confidence among the electorate that the system is fair. We do not serve the process well with our decision today.

For these reasons, I respectfully dissent.